JUAN RAMÓN ZAMBRANA y DIGNA CRUZ, demandantes y recurrentes, *v.* HOSPITAL SANTO ASILO DE DAMAS, demandado y recurrido.

*Número:* R-78-97          *Resuelto:* 26 de marzo de 1980

518

*César A. Hernández Colón, José Enrique Ayoroa Santaliz* y *Fernando Barnes Vélez*, abogados de los recurrentes; *Vivas & Martínez-Texidor*, abogados del recurrido.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

Juan Ramón Zambrana y Digna Cruz instaron demanda por daños y perjuicios contra el Hospital Santo Asilo de Damas de Ponce, responsabilizándolo por la muerte de su hijo recién nacido Ramón Luis. Alegaron que la muerte fue causada por una infección generalizada o sepsis provocada al administrársele al bebé, por una enfermera empleada de dicho Hospital, sin autorización médica, un suero que estaba contaminado. El Hospital negó negligencia. Los esposos Zambrana Cruz recurren ante nos contra sentencia que desestimó su demanda. Señalan, como único error, que el tribunal a quo concluyera que la prueba por ellos presentada no estableció la contaminación del suero y que éste provocara la muerte del bebé. Un cuidadoso análisis de la prueba, que es eminentemente de orden pericial, nos mueve a revocar.

El bebé Ramón Luis Zambrana Cruz, de diez y siete días de nacido, fue ingresado en el Hospital Santo Asilo de Damas el 11 de octubre de 1974 bajo el cuidado de su médico particular y especialista en pediatría, Dr. Luis H. Rodríguez. Su diagnóstico de gastroenteritis causada por la bacteria *Escherichia coli* fue confirmado mediante los correspondientes análisis de laboratorio. Le prescribió como tratamiento dieta, un antibiótico y un suero intravenoso de 10 c.c. de glucosa en agua al 5% y 25 c.c. de solución normal salina.

El tratamiento fue efectivo. Ya el día 12 se notaba mejor y se ordenó darle líquidos claros. El 13 lo vio el Dr. Miguel López Rodríguez, pediatra que sustituía al Dr. Rodríguez García los fines de semana, y dispuso que se le comenzara a dar leche a base de la fórmula Isomil, la cual toleró. El 14 lo vio el Dr. Rodríguez por la mañana y ya no tenía diarrea, sus deposiciones eran color normal, no eran verdosas como al principio. El bebé estaba activo. Ordenó descontinuar los sueros. Lo volvió a ver esa tarde y lo halló "lo más bien", sin diarrea, sin el suero, que se le había quitado a eso de las 10:30 de la mañana. El niño toleraba la alimentación oral que se le daba.

En la mañana del día 15, entre 7:30 y 8:00, el Dr. Ro-

dríguez García volvió a visitar al niño y lo examinó. No tenía diarrea, no vomitaba, estaba hidratado, toleraba la leche, no tenía fiebre ni distensión abdominal, estaba activo, su bazo y su hígado no eran palpables, sus pulmones estaban claros y su corazón estaba bien. Lo halló curado y dispuso darlo de alta, lo que anotó en las órdenes médicas (*Discharge* y *appointment to Dr. Paravisini office in two weeks*). No obstante, la madre del niño le indicó que había evacuado y para tranquilizarla le dijo que se quedara en el hospital hasta la tarde, cuando viniera su esposo. No dispuso más medicación, excepto un antidiárreico si fuese necesario.

Así las cosas, entra en el cuadro la enfermera Adelaida Boothby, empleada del Hospital, quien a la sazón hacía 45 días que se había graduado de enfermería. Nunca había intervenido con el niño. A las 8:30, es decir, alrededor de media hora después que el niño fue visto y hallado curado por el Dr. Rodríguez, esta enfermera dictaminó que se hallaba deshidratado. Sus notas al respecto aparecen apretujadas al final de la quinta página del récord o informe de enfermera, en contraste con las demás en dicho récord, que son claras, escritas en su mayoría a doble espacio (*Exhibit* A, parte Demandante). Decidió la enfermera Boothby que había que volver a ponerle el suero al niño. El suero había permanecido en su habitación desde la mañana del día anterior, expuesto al ambiente con sus tubos y la aguja hipodérmica que se habían usado. La madre protestó que el bebé había sido dado de alta. La enfermera contestó que ella sabía lo que hacía. Sin consultar al médico del niño ni a ningún otro médico, quitó los tubos y aguja al viejo suero, le puso tubos y aguja nueva, y lo inyectó en la vena al bebé ese día entre 10:30 y 11:00 de la mañana.

A las 12:30—escasamente dos horas más tarde—la condición del niñito era crítica. Fue necesario ponerlo en cámara de oxígeno debido a que estaba cianótico. Se llamó al Dr. Rodríguez. Cuando éste lo vio poco después de las 2:00 de la tarde, el niño presentaba el siguiente cuadro: estaba cianótico,

tenía taquicardia y diarreas sanguinolentas, respiraba rápidamente, estaba severamente deshidratado, su bazo y su hígado se podían palpar, y estaba hipoactivo. Era un cuadro nuevo, no visto antes. Intervino el Dr. López, pediatra que en unión al Dr. Rodríguez había estado atendiendo al niño. Convinieron que era un cuadro de septicemia. Se llamó a consulta a un neurólogo, Dr. Winston Ortiz, quien también tuvo impresión de un posible caso de septicemia y dispuso *rule out* dicha posibilidad. La condición de taquicardia aconsejó consultar a un cardiólogo pediátrico, Dr. Francisco Torres Aybar. Así se hizo. También determinó este facultativo la probabilidad de sepsis. El estado del bebé continuó en rápido deterioro. Falleció a las 2:00 de la mañana del 16 de octubre, quince horas después de la intervención de la enfermera Boothby reinyectándole el suero.

En muy raras ocasiones es posible determinar un hecho con certeza o exactitud matemática. Exigir ese tipo de prueba a un litigante equivaldría prácticamente a requerirle un imposible. Por ello, la ley y la jurisprudencia se limitan a requerir que los casos se prueben por preponderancia de prueba, que es tanto como establecer como hechos probados aquellos que con mayores probabilidades ocurrieron. *Rivera* v. *E.L.A.*, 99 D.P.R. 890, 898–899 (1971). No es necesario probar un hecho con exactitud matemática. *Castro* v. *Payco, Inc.*, 75 D.P.R. 63, 75 (1953); *Colón* v. *Shell Co. (P.R.) Ltd.*, 55 D.P.R. 592, 620 (1939). El demandante en una acción civil no está obligado a probar un caso más allá de duda razonable. Tampoco se le exige, en casos de responsabilidad por culpa o negligencia, excluir toda otra posible causa de daño. *Prieto* v. *Maryland Casualty Co.*, 98 D.P.R. 594, 627 (1970); *Murcelo* v. *H. I. Hettinger & Co.*, 92 D.P.R. 411, 427 (1965).

Señalamos en *Oliveros* v. *Abréu*, 101 D.P.R. 209, 228 (1973), que en cuanto a hospitales y clínicas se refiere el grado de cuidado que se requiere es aquél que deba ejercer una persona prudente y razonable. Véanse, además, los casos allí citados. No deberá exigirse en estos casos más calidad o

*quantum* de prueba que el requerido en cualquier caso ordinario en que se reclame por daños y perjuicios causados por culpa o negligencia.

■ La prueba en el caso ante nuestra consideración consistió esencialmente en testimonio pericial, que es lo que ocurre las más de las veces en casos de responsabilidad de médicos y de hospitales e instituciones dedicadas al cuidado y tratamiento de enfermos. Ante este tipo de prueba consideramos que estamos en iguales condiciones que el tribunal de instancia y en libertad de adoptar nuestro propio criterio. *García* v. *A.F.F.*, 103 D.P.R. 356, 366 (1975). Dijimos en *Prieto* v. *Maryland Casualty Co.*, supra, pág. 623:

"Consistentemente hemos resuelto que ningún tribunal está obligado a seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito o facultativo, sobre todo cuando está en conflicto con testimonios de otros peritos y que todo tribunal está en plena libertad de adoptar su criterio propio en la apreciación o evaluación de la prueba pericial y hasta descartar la misma aunque resulte ser técnicamente correcta."

Además de los casos citados en *Prieto*, véanse *Alonso García* v. *Comisión Industrial*, 103 D.P.R. 712, 714–715 (1975); *Rodríguez Retamar* v. *Maldonado*, 100 D.P.R. 662, 665 (1972); *Valldejuli Rodríguez* v. *A.A.A.*, 99 D.P.R. 917, 921 (1971).

Examinemos la cadena de causalidad necesaria para responsabilizar al hospital demandado, y la prueba presentada a fin de establecerla. Era necesario probar:

I. Que el suero estaba contaminado
II. Que el suero contaminado le causó sepsis al bebé
III. Que la sepsis le causó la muerte.

I

*La contaminación del suero.*

No hay controversia en cuanto a que el suero que se le inyectó al recién nacido el 15 de octubre por la mañana no había sido prescrito por médico alguno en esa ocasión, y que fue el mismo suero que se administró el 13 de octubre a las

7:00 de la mañana, se descontinuó el 14 a las 10:39 A.M., y se mantuvo en la habitación hasta su nuevo uso el 15 de octubre.

Para establecer la contaminación del suero se utilizaron los testimonios de los doctores Luis H. Rodríguez y Miguel López Rodríguez. El Dr. Rodríguez declaró que no es una buena práctica médica el que se le apliquen medicamentos a un paciente sin que el doctor los ordene, y que él no ordenó que se le administrara suero al bebé el 15 de octubre por la mañana. Declaró que una vez se expone un suero como el del caso de autos al medio ambiente, insertando una aguja ([1]) por su tapa, hay que administrarlo al paciente inmediatamente. Estos sueros tienen preservativos que duran dos o tres horas. Si se deja expuesto al ambiente, perforado con la aguja metida, tiene muchas probabilidades de contaminarse.

El Dr. Miguel López Rodríguez declaró que no era buena práctica volver a administrar un suero que ha permanecido expuesto como el de autos; ni tampoco es buena práctica administrar un suero sin orden médica. Su opinión es que ese suero podía contaminarse.

Para controvertir estos testimonios la parte demandada presentó el testimonio del Dr. Jaime Rivera Dueño. Además, señaló que no se había realizado examen alguno de la botella ni del suero para establecer su contaminación. Opinó el Dr. Rivera Dueño que, por la forma en que los sueros están hechos hoy en día, no se pueden contaminar a menos que directa y maliciosamente se le inyecte algo.

Estudios recientes contradicen la opinión del Dr. Rivera Dueño y revelan la existencia de la contaminación de sueros y el nexo causal entre esa contaminación y la sepsis o septicemia contraída por pacientes hospitalizados. Véanse Duma, Warner, y Dalton, *Septicemia from Intravenous Infusions*, New England Journal of Medicine 284, 257–260 (1971); y Felts, Schaffner, Melly y Koenig, *Sepsis Caused by Contaminated Intravenous Fluids*, Annals of Internal Medicine, 77, 881–890

---

([1]) La aguja se conoce como *piercing pin. Exhibit* VII del demandado.

(1972). (²) Señalan que la infección puede ser causada por el catéter o sonda intravenosa que permanece en la vena (*indwelling intravenous catheters*); por contaminación de la tapita de la botella que contiene el suero (*bottle screw cap*); por contaminación intrínseca del fluido intravenoso y de la botella; o contaminarse al ser manipulado y administrado el suero (*in contamination*). Señalan estos estudios que la contaminación guarda una relación directa con el tiempo durante el cual se usan los sueros—a mayor tiempo que están en uso, mayor probabilidad de contaminación—y que una vez está en uso todo el aparato intravenoso, la contaminación es fácil.

Más aún, estudios recientes en Estados Unidos revelan que definitivamente no es poco probable ni especulativa la contaminación de suero en hospitales y, como consecuencia, la infección de pacientes. Las infecciones entre pacientes hospitalizados han aumentado considerablemente desde 1935. En 1958, se diagnosticó sepsis en 0.8 por 1,000 admisiones en hospitales. Diez años más tarde, en el 1968, había aumentado esta proporción a 8.0 por 1,000, y recientemente se calculó en 10 por cada 1,000 admisiones en hospitales. Harrison, *Principles of Internal Medicine*, 7ma ed., 1974, pág. 734. Esta tendencia ha cobrado ímpetu debido a los siguientes factores: el hecho de que los pacientes tienen enfermedades que, de por sí, los debilitan; el amplio uso de antibióticos y otras medicinas; y el uso del catéter intravenoso y otro equipo de hospital. Harrison, *supra*. Señala Harrison, págs. 730 y 732:

"A nosocomial infection is an infection occurring during hospitalization, usually in a patient with a defect in host resistance.

... The hospital patient is subjected to a variety of diagnostic and therapeutic procedures which predispose to infection. These include insertion of intravenous catheters and urethral catheterization, particularly if an indwelling catheter is left in place.

.    .    .    .    .    .    .    .

Invasion of the bloodstream can occur in any nosocomial infection. . . . However, the indwelling venous catheter is fast

---

(²) Ambos artículos aparecen sometidos al tribunal a quo en fotocopia.

becoming the most common source of bacteremia in hospitalized patients. . . .

A number of cases of bacteremia emanating from intravenous infusion sets have been reported. Usually contamination occurs after the set has been placed into use, and the screw cap appears to be the most vulnerable site for introducing exogenous bacteria. . . . In the most instances, contamination could be traced to faulty technique involved in changing bottles, adding medications, adjusting air filters, etc., and attention to the details of handling these materials by *all hospital personnel* is essential if this complication is to be prevented." (Énfasis suplidos por el autor.)

El testimonio del Dr. Rivera Dueño no refutó lo declarado por los doctores Rodríguez y López sobre la administración de suero a un paciente sin orden médica a tales efectos. Su contestación sobre el particular fue evasiva e imprecisa.

▪▪▪ Argumentan los recurridos que no se probó la contaminación porque no se hizo cultivo del suero ni de su envase. Aceptar este razonamiento conduciría al absurdo de que únicamente por prueba directa se puede establecer un caso de contaminación. Nuestra jurisprudencia no exige examen científico para que se establezca la contaminación de un producto y, por ende, la causalidad entre dicha contaminación y los daños sufridos por un demandante. *Castro* v. *Payco, Inc.*, supra, pág. 75. Esta norma no es de aplicación exclusiva a casos de productos de consumo. Se basa en el principio, ya señalado, que la ley no exige que un hecho se pruebe con certeza matemática, y que la evidencia circunstancial es intrínsecamente igual que la evidencia directa. *Pueblo* v. *Salgado Velázquez*, 93 D.P.R. 380, 383 (1966).

Nuestro análisis de la prueba pericial, las autoridades médicas consultadas y las circunstancias particulares a los hechos ante nos, nos conducen a la inferencia de que el suero que la enfermera Boothby administró al bebé el 15 de octubre estaba contaminado. ([3])

[3] En la vista oral celebrada ante este Tribunal se planteó, por primera vez, el hecho de que el padre del recién nacido, al saber la suerte de su hijo, se llevó la botella de suero del hospital. La misma fue presentada en evidencia y admitida *sin* objeción como *Exhibit* 5 de la parte demandante. (Minuta de 5 de noviembre de 1976.) No

## II

*La septicemia y el suero.*

Pasemos a examinar si, según la prueba presentada, el recién nacido se enfermó de septicemia el 15 de octubre y si ésta fue causada por el suero.

La septicemia es un término inexacto, y significa la circulación en la sangre de bacterias y sus productos, llamados endotoxinas o exotoxinas. Puede causar la muerte. Conn y Conn, *Current Diagnosis*, 1971, pág. 168. "Es una condición en la que micro-organismos y sus productos metabólicos están presentes en la sangre en grandes cantidades y, como los organismos se reproducen en la sangre, se produce una infección de la corriente sanguínea. La infección puede ser el resultado de una contaminación abrumadora de la sangre, que se origina de otro foco primario de infección, o que puede ser causada por un fracaso de los mecanismos de defensa usuales contra semejante invasión". Stowens, *Pediatric Pathology*, 2da ed., 1966, pág. 538. Requiere un foco de infección y comunicación con la corriente sanguínea o con las glándulas linfáticas. Cantor, *Traumatic Medicine and Surgery for the Attorney*, 1963, Vol. 9, pág. 223. Su mortalidad es significativa, [4] particularmente entre los recién nacidos. Cantor, *supra*, pág. 221; Harrison, *supra*, pág. 739; Nelson, *Textbook of Pediatrics*, 10ma ed., 1975, pág. 398.

El recién nacido en el caso de autos había sido hospitalizado por gastroenteritis. No surge de la prueba que antes de serle administrado el suero por la enfermera Boothby el 15 de octubre tuviera otra enfermedad. Lo que se desarrolló luego de la administración de ese suero fue un cuadro clínico nuevo. ¿Era septicemia?

---

vemos qué repercusión pueda tener la actuación del padre a la luz de que la botella fue presentada y admitida en evidencia. Obviamente no fue un caso de ocultación de evidencia. No hubo controversia alguna en cuanto a la botella usada, según surge de una lectura de la sentencia recurrida. Tampoco sufrió perjuicio la demandada, evidenciado por su falta de objeción a la admisión de la botella y por la total ausencia de señalamiento al respecto, tanto en el tribunal a quo como en sus alegatos ante este Tribunal.

[4] La mortalidad del *shock* séptico es de 50%, Harrison, *supra*, pág. 739.

Para establecer que sí lo era los demandantes presentaron el testimonio de los cuatro doctores que intervinieron directamente con el bebé y su tratamiento: el Dr. Luis H. Rodríguez García; el Dr. Miguel López Rodríguez; el Dr. Francisco Torres Aybar; y el Dr. Winston R. Ortiz. El demandado presentó los testimonios del Dr. Jaime Rivera Dueño y de la enfermera Adelaida Boothby para establecer que el niño no llegó a curarse de la gastroenteritis, y que lo que sufrió el 15 de octubre fue una agravación de la misma.

■ Aunque la observación personal del paciente por el perito médico no es un factor decisivo en todos los casos para determinar su valor persuasivo, es significativo que en este caso cuatro facultativos que testificaron por los demandantes vieron y trataron al niñito durante la crisis, mientras que el Dr. Rivera Dueño jamás lo vio, ni vivo ni muerto. Los doctores Rodríguez García y López Rodríguez son ambos especialistas en pediatría. El primero era el médico a cargo precisamente de los casos de diarrea en la Sección de Pediatría del Hospital de Distrito de Ponce. Ambos trataban al bebé Zambrana Cruz y le visitaron y examinaron durante su enfermedad, antes y después de la crisis surgida luego de la administración del suero el 15 de octubre. El Dr. Ortiz, neurólogo, examinó al niño en consulta luego de surgir dicha crisis. Todos coincidieron en que se trataba de un caso de septicemia. En cuanto al testimonio de la enfermera Boothby, la propia juez de instancia señaló que no le mereció crédito.

Impresionó al tribunal a quo que el Dr. Rodríguez no ordenó cultivo de la excreta ni otra prueba de laboratorio para determinar que el niñito estaba curado. Notamos la errónea tendencia a exigir un grado de prueba que, si deseable, no puede ser exigido. No puede excluirse toda posibilidad de error. *Prieto* v. *Maryland Casualty Co.*, supra, y *Murcelo* v. *H. I. Hettinger & Co.*, supra.

■ La determinación del tribunal a quo sobre la condición del recién nacido antes de administrársele el suero el 15 de octubre no representa el balance más racional, justiciero y

jurídico de la totalidad de la prueba. *Sanabria* v. *Sucn. González*, 82 D.P.R. 885, 997 (1961). La declaración de la enfermera Boothby contrasta con las observaciones de las otras enfermeras que atendieron al bebé con anterioridad. (Informe de Enfermeras, *Exhibit* 2 de los demandantes.) Surge del Informe de Enfermeras que antes del 15 de octubre por la mañana, y a medida que progresaba el tratamiento, las evacuaciones del bebé pasaron de diarréicas, blandas y verdosas a semiblandas, pastosas y de color marrón oscuro. Las evacuaciones fueron disminuyendo en frecuencia. El bebé recibía alimentación oral y la toleraba. Ninguna otra enfermera había anotado que la piel del bebé estuviera descolorada. Su última evacuación antes del turno de la Srta. Boothby no había sido diarréica. Además, la Srta. Boothby hizo su observación la primera vez que entró a cuidar al bebé. Sólo contaba con 45 días de graduada.

Estos factores nos convencen de que la apreciación más acertada de la condición del bebé fue hecha por el Dr. Rodríguez, pediatra que lo atendió desde su ingreso al Hospital. La mejoría observada por el Dr. Rodríguez halla apoyo en el testimonio del Dr. López, quien también atendió al bebé. Declaró que para el 13 de octubre su estado no revelaba deshidratación, su excreta estaba bien y no era diarréica. Las notas de las enfermeras también indican la mejoría del pacientito.

El hecho de que el Dr. Rodríguez hubiera decidido dejar al recién nacido en el hospital hasta la tarde no contradice su determinación de que estuviese curado. Explicó que la evacuación indicada por la mamá del bebé era normal; que ordenó el *Donagel* por contingencia, por si le daba diarrea, y que dejó al niño hasta la tarde para tranquilizar a su mamá.

Para resumir, concluimos a base de la prueba directa y pericial presentada por los demandantes, que el recién nacido estaba en las condiciones descritas por el Dr. Rodríguez el 15 de octubre por la mañana. Estaba bien antes de que la Srta. Boothby le administrara el suero contaminado. Al volverlo a

ver a las 2:30 de la tarde, después del suero, el estado del niño era crítico. El Dr. Rodríguez diagnosticó sepsis. Consultó con el Dr. Winston Ortiz, neurólogo, quien sugirió *rule out sepsis neonatorum* como primera prioridad. Por *rule out* se entiende una indicación de que se explore una posibilidad para determinar si se descarta.

La existencia de septicemia en un recién nacido es indicada por cianosis, problemas respiratorios, letargia o hipoactividad, *tachypnea*, o respiración anormalmente rápida; (5) diarreas y vómitos; (6) hemorragia (*bléeding*); *hepatomegalia* (crecimiento anormal del hígado) (7) y *esplenomegalia* (crecimiento anormal del bazo). (8) Nelson, *Textbook of Pediatrics*, 10ma ed., 1975, tabla 7-26, pág. 398. Luego de serle administrado el suero contaminado, el recién nacido mostró todos esos síntomas. Como indicamos en páginas anteriores, la septicemia es una infección seria, y sigue un curso fulminante en los recién nacidos, con alta mortalidad. Nelson, *supra*, pág. 398. Se distingue por la ausencia de señales o síntomas específicos en sus primeras etapas. Nelson, *supra*, pág. 399. El hecho de que el recién nacido en el caso de autos haya tenido la temperatura normal no indica la ausencia de infección. A este efecto nos merece crédito la siguiente explicación dada por el Dr. Rodríguez (pág. 15 de la transcripción de su testimonio):

"Estos casos de sepsis, estos niños o cualquier persona que tenga una condición tan grave como una septicemia, al decir septicemia yo quiero decir infección bacterial generalizada, es una infección que le coge a uno todos sus órganos no un lado nada más, y le afecta el cerebro. En el cerebro nosotros tenemos los centros de termoregulación y una persona puede tener una sepsis brutal y puede tener o la temperatura bien alta o puede tener la temperatura normal o puede tener la temperatura baja porque ese centro de termoregulación no

---

(5) Schmidt, *Attorney's Dictionary of Medicine*, 1962, Vol. 3.

(6) Surge del Informe de Enfermeras que al entrar el bebé en crisis, sufrió de vómitos de sangre.

(7) Schmidt, *supra*, Vol. 2.

(8) Schmidt, *supra*, Vol. 3.

está funcionando; está funcionando a lo loco, esto es, una máquina que está funcionando sin uno saber a qué lado va a tirar."

Esta explicación del Dr. Rodríguez no fue contradicha. Por otro lado, halla apoyo en la citada obra de Nelson, págs. 351 y 399, en que se señala que frecuentemente la temperatura de un recién nacido no sube cuando hay infección.

En la diarrea, los vómitos no son un síntoma constante. Nelson, *supra*, pág. 403. El bebé en el caso de autos tuvo sus primeros vómitos luego de que se le pusiera el suero contaminado. La sangre generalmente no es perceptible o conspicua macroscópicamente en la diarrea, Nelson, *supra*, pág. 402. El bebé en el caso de autos sufrió de diarreas con sangre, vomitó sangre y sufrió de hemorragia por la nariz, boca y recto luego de que se le administrara el mencionado suero. Véanse el testimonio del Dr. Rodríguez, pág. 12; y el Informe de las Enfermeras, *Exhibit* 2 de los demandantes. La diarrea no causa *esplenomegalia*, y en el caso de autos el Dr. Rodríguez halló el bazo palpable, por ende, recrecido. Nelson, *supra*, pág. 1161.

El testimonio del Dr. Rivera Dueño señaló que la diarrea puede provocar deshidratación y desbalance electrolítico. El recién nacido estaba deshidratado el 15 de octubre luego de administrarle el suero. El desbalance electrolítico señalado por el Dr. Rivera Dueño nunca se probó. No llegó a ser más que una posibilidad. De todo el récord médico, lo único que señala la posibilidad de problemas en los electrolitos es la interpretación del electrocardiograma. Lo aquí señalado no debilita la conclusión de que el recién nacido sufrió de septicemia. El electrocardiograma mostró "un posible cambio en la onda T". Los electrocardiogramas de pacientes con septicemia generalmente muestran una inversión de las ondas T. Harrison, *Principles of Internal Medicine*, 7ma ed., 1974, pág. 736. La septicemia también provoca disturbios electrolíticos, y la consecuente deshidratación, pues puede

causar acidosis, [9] *hiponatremia* [10] e hipocloremia. [11] Nelson, *supra*, pág. 400;Harrison, *supra*, págs. 735, 736. La deshidratación frecuentemente acompaña la acidosis. [12] Asimismo, un fenómeno concomitante de la acidosis es la pérdida de potasio. [13] El cloro, el sodio y el potasio son electrolitos. Testimonio del Dr. Rivera Dueño, pág. 3. Por tanto, de ser aceptada la tesis del Dr. Rivera Dueño sobre la pérdida de potasio, el desbalance en los electrolitos, y la deshidratación, no se excluye la septicemia. A esto hay que añadir que al recién nacido se le suplió potasio por la vía oral, mediante la fórmula lactante *Isomil*. [14]

Señala el tribunal a quo que el hematocrito del paciente indicaba una severa deshidratación, tanto cuando fue ingresado como el día 15 de octubre, pues en el primero fue de 53 y el segundo de 51. El hematocrito, explica el tribunal, determina la proporción de células rojas y plasma en la sangre. (Sentencia, pág. 18.) El hecho de que sea alto no excluye la presencia de septicemia, porque en ella es generalmente elevado el volumen de células rojas aglutinadas. Harrison, *supra*, pág. 736. Por otro lado, la conclusión del tribunal a los efectos de que el hematocrito era alto e indicativo de severa deshidratación es inusitada. El hematocrito en los infantes de dos semanas de nacidos fluctúa entre 42 y 66, y la media (*mean*) es 50. Nelson, *supra*, tabla 14-3, pág. 1110. De ser el hematocrito de 51 una condición anómala, no caería dentro del campo de valores hematológicos normales.

A base de la discusión precedente, procede concluir que el

[9] La acidosis es un desarreglo de la química del cuerpo humano, en el que el contenido del ácido en la sangre es muy alto, o el contenido de bicarbonato es muy bajo. Schmidt, *Attorney's Dictionary of Medicine*, 1962, Vol. 1.

[10] La *hiponatremia* es una deficiencia de sodio en la sangre. Maly, *Medicals Dictionary of Lawyers*, 3ra ed., 1960.

[11] La hipocloremia es una condición en la que la sangre contiene una cantidad de cloruro menor que la normal. Schmidt, *supra*, Vol. 2 (1962).

[12] *El Manual de Merck de Diagnóstico y Terapéutica*, Merck & Co., 8va ed., pág. 270.

[13] *Id.*, a la pág. 272.

[14] Nelson, *supra*, tabla 3-12, pág. 174.

bebé se vió afectado por septicemia luego de que el Dr. Rodríguez lo dio de alta. Así lo indica la evidencia pericial presentada. La totalidad de la prueba, analizada tomando como base el criterio de las mayores probabilidades, establece cumplidamente la relación causal entre la administración del suero por la enfermera Boothby sin autorización alguna, y el desarrollo de la septicemia. A estos efectos, los testimonios de los peritos de los demandantes son más confiables y de mayor peso. Nos remitimos, además, a lo discutido en páginas anteriores en cuanto al nexo causal entre la administración de suero contaminado y la septicemia entre pacientes hospitalizados.

## III

*La causa de la muerte.*

La parte demandante presentó prueba a los efectos de que el recién nacido murió a causa de la septicemia provocada por el suero contaminado. Ésta consistió en el testimonio del Dr. Rodríguez, unida a toda la cadena de evidencia presentada para probar la existencia de la septicemia.

El demandado presentó los testimonios de los doctores Rivera Dueño, Vallejo y Criado, para establecer que el niño murió a consecuencia de la gastroenteritis que le aquejaba, complicada con una deshidratación severa. Declaró el Dr. Rivera Dueño que se ignoraba cuál era la verdadera condición del bebé, debido a las deficiencias en el tratamiento que antes había señalado. Como consecuencia, concluyó que su diarrea nunca fue curada y que su condición culminó en un desbalance electrolítico y deshidratación, causándole la muerte. Aceptando la teoría del Dr. Rivera Dueño, ¿qué fue lo que produjo tal gravedad súbita? Es un hecho innegable que se le inyectó un suero no prescrito y entonces se produjo el cuadro crítico. *Si el suero no estaba contaminado, y el niño se agravó y deshidrató de momento, el suero debió hacerle bien, y no mal.* ¿Por qué entonces ese súbito cambio hacia lo peor una vez se le administró el suero el 15 de octubre? Como bien señaló el Dr.

Rivera Dueño mientras era contrainterrogado, no se puede decir cómo estaban los electrolitos ni el estado de la sangre del recién nacido en lo que a bases y ácidos se refiere, porque estos factores nunca fueron examinados. Sus expresiones no se basan en la apreciación directa de la condición del paciente, porque nunca lo examinó ni vivo ni muerto. Ni tan siquiera se basa su conclusión sobre el desbalance electrolítico en los récords médicos, pues éstos carecen de información alguna al respecto.

El 17 de octubre de 1974, el Dr. José M. Vallejo, patólogo forense, practicó la autopsia del recién nacido. Observó que el cadáver presentaba un estado de deshidratación y que estaba desnutrido. En el estómago, intestino delgado e intestino grueso había una marcada congestión de su mucosa, recubierta en algunas áreas con material mucoide. El informe de la autopsia obra en autos como evidencia ofrecida y no admitida y surge de él que los pulmones estaban congestionados y con edema. El patólogo diagnosticó que el bebé murió a causa de una gastroenteritis aguda severa y deshidratación severa. ¿Es esto incompatible con la existencia de una infección generalizada en el organismo del bebé?

El Dr. Rafael Criado, patólogo forense del Instituto de Medicina Legal de Puerto Rico, estudió el récord clínico del bebé e hizo un estudio y análisis de muestras de órganos del cadáver tomadas durante la autopsia.

Halló que los tejidos de los riñones eran normales, al igual que los del bazo. No mostraban señales de sepsis. Los tejidos de los intestinos estaban muy inflamados, pero no tenían petequias. Un examen microscópico revelaba numerosos moldes de glóbulos rojos. Explicó que todos estos exámenes microscópicos demostraban que al morir el bebé padecía de gastroenteritis severa y de deshidratación severa. Repetimos ahora, ¿es esto incompatible con la existencia de una infección generalizada?

El tribunal sentenciador determinó que:

"En relación a la autopsia practicada al infante en este caso, la

causa de la muerte no quedó diáfanamente establecida como frecuentemente ocurre en autopsias hechas a bebés en su primer mes o período neo-natal.

El bien logrado e inteligente contrainterrogatorio ‘hecho al patólogo doctor Criado por el abogado de los demandantes estableció el que prácticamente casi todos los hallazgos en la autopsia, tanto microscópicos como macroscópicos, eran compatibles con Sepsis...." (Sentencia, pág. 28.)

La autopsia no es más que un diagnóstico final basado en los cambios patológicos' observados durante aquélla y los resultados de los estudios subsiguientes de laboratorio. [15] La determinación de la causa de la muerte es subjetiva, y no es un juicio absoluto e inatacable. [16] Los hallazgos de autopsias en casos de sepsis son escasos y poco específicos, y tienden a reflejar la infección primaria. Harrison, *supra,* pág. 735. La autopsia en el caso de autos reveló inflamación de los tejidos de los intestinos, y la presencia de una marcada congestión de la mucosa de estos órganos. A base de esto no podía concluirse que padecía de diarrea y que por ello murió, ignorando la existencia de septicemia. Se dice en la obra del Dr. Stowens, *Pediatric Pathology,* 2da ed., 1966, pág. 318:

"The pathology of epidemic diarrhea of the newborn is peculiar in that its morphologic expression is exactly the opposite to what one would expect, for not only is there complete absence of signs of inflammation either in the bowel or elsewhere, but there appears to be a depression of the lymph nodes."

En la diarrea causada por la *Escherichia coli,* es notable la ausencia de inflamación o ulceración abundante en la mucosa intestinal. Silverman, Roy y Cozzetto, *Pediatric Clinical Gastroenterology,* 1971, pág. 135.

En casos de septicemia, los pulmones están entre los órganos más susceptibles a las endotoxinas, y generalmente desarrollan congestión y edema. Harrison, *supra,* pág. 736. Los pulmones del recién nacido en el caso de autos estaban en

---

[15] Froede, *The Medicolegal Investigation: Evolution of Cases with Potential Medical Litigation,* Legal Medicine Annual, 1977, pág. 3.

[16] *Id.,* pág. 13.

iguales condiciones, según surge de la autopsia. Ello apoya la conclusión de que sufrió la septicemia, no la contraría a los efectos de que sufrió diarrea que le causó la muerte.

También resulta incorrecto descartar la septicemia por la deshidratación observada, y por el nivel de los hematocritos y de moldes de glóbulos rojos. Como señalamos en páginas anteriores, la septicemia provoca desbalance en los electrolitos, acidosis, y como consecuencia, deshidratación. También hemos señalado que en la septicemia, el volumen de células rojas aglutinadas es alto.

Como hemos señalado, el tribunal recurrido concluyó que "la causa de la muerte no quedó diáfanamente establecida" por la autopsia, y que "prácticamente casi todos los hallazgos en la autopsia, tanto microscópicos como macroscópicos, eran compatibles con sepsis". Señalan los recurrentes, sin que hayan sido contradichos, que el médico que practicó la autopsia declaró que al hacerla "no tenía la totalidad del récord médico del bebé"; que admitió que entendía errónea-mente que el desarrollo del bebé había sido de continuo deterioro desde su admisión al hospital; que no ordenó realizar cultivos de líquidos del cuerpo a pesar de que éstos hubiesen reflejado la existencia de una sepsis y a pesar de que los hallazgos macroscópicos eran compatibles con sepsis; y, finalmente que dicho médico admitió que no hizo los cultivos que hubieran revelado la presencia de septicemia, según sus palabras, "porque yo no estaba buscando sepsis".

Ante este cuadro, no puede concluirse que no hubiera sepsis y que ésta fuera la causa de la muerte. El organismo del bebé, aunque mejorado de la condición que lo llevó al hospital, tuvo que debilitarse debido a su enfermedad y debía estar debilitado cuando se le inyectó el suero. Aun si para el 15 de octubre el bebé no hubiese estado totalmente curado, es obvio que su mejoría era notable. Negar este hecho sería contrario a los testimonios de los pediatras que atendían al bebé y a las anotaciones hechas por las enfermeras del hospital. La explica-cion más razonable y la más convincente es que el suero le

provocó el súbito deterioro que sufrió su condición y que le produjo la muerte en pocas horas, no obstante los esfuerzos de cuatro facultativos, cada uno especialista en su ramo, por salvarle la vida.

La prueba reseñada y en análisis que de ella hemos hecho a la luz de los criterios valorativos ya expresados nos mueven a concluir que erró el tribunal de instancia al declarar sin lugar la demanda, *se revocará la sentencia recurrida, se declarará con lugar la\demanda, y se devolverán los autos a la sala de instancia para que se determine, previos los trámites pertinentes, el monto de los daños que haya derecho a recobrar.*