*790 TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos el Procurador General, en adelante, el apelante, en representación del Estado Libre Asociado de Puerto Rico, solicitando la revocación de una Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Ponce. Mediante dicho' dictamen, el tribunal a quo declaró Con Lugar la demanda incoada por la parte apelada.
Por las razones que expresamos a continuación, se Confirma la Sentencia apelada.
I
Conforme surge del recurso ante nuestra consideración, el 20 de noviembre de 1992, Glidden R. Pérez Díaz, Gertrudis Nieves Echevarría, la sociedad legal de gananciales compuesta por ambos, Glidden E. y Marisell Pérez Nieves, en adelante, los apelados, incoaron demanda sobre daños y perjuicios contra, entre otras partes, el Hospital Pediátrico de Puerto Rico, la Universidad de Puerto Rico, el Estado Libre Asociado de Puerto Rico, el Hospital Tito Matei de Yauco y el Hospital José M. Gándara de Ponce.
En la demanda presentada, se alegó que el 28 de junio de 1986, el niño José Gustavo Pérez Nieves, en adelante, José Gustavo, quien para dicha fecha contaba con cinco (5) años, padecía de varicelas hemorrágicas. A tales efectos, fue ingresado en el Hospital Tito Matei de Yauco y, posteriormente, trasladado al Hospital José M. Gándara de Ponce, en adelante, Hospital Regional de Ponce.
Una vez en el Hospital Regional de Ponce, se le realizó un examen para determinar el conteo de sus plaquetas, determinándose que se encontraban extremadamente bajas. Por consiguiente, se le efectuaron varias transfusiones de sangre. Entre el 29 de junio y el 4 de julio de 1986, se le transfundieron entre cuarenta y cinco (45) y cincuenta y seis (56) unidades de sangre. 
José Gustavo fue nuevamente transferido, esta vez, al Hospital Pediátrico de Río Piedras. En dicha institución, el niño se recuperó de su enfermedad y fue dado de alta el 14 de julio de 1986. Sin embargo, siguió recibiendo tratamiento ambulatorio hasta el 28 de septiembre de 1987, fecha en que fue dado de alta definitivamente. Es pertinente mencionar, que en el Hospital Pediátrico de Río Piedras, por instrucciones de su médico, le fue practicada una transfusión de sangre a José Gustavo.
Desde el 1987 hasta octubre de 1991, José Gustavo disfrutó de una vida completamente saludable y normal para un niño de su edad. Dedicaba la cotidianidad de su tiempo a ir a la escuela, jugar baloncesto e ir a la Iglesia. No obstante, a finales de octubre de 1991, contando con once (11) años de edad, José Gustavo empezó a padecer de graves problemas de salud. Los mismos comenzaron con fatiga y dificultad al respirar. Lo anterior motivó que sus padres llevaran al menor ai Centro de Salud del Municipio de Peñuelas.
De dicho Centro de Salud fue trasladado al Hospital Tito Matei de Yauco preséntando un cuadro de tos, fiebre y dificultad al respirar. Su condición no parecía mejorar, a pesar de la aplicación de fuertes antibióticos, razón por la cual José Gustavo fue transferido el 15 de noviembre de 1991 al Hospital Regional de Ponce.
El mismo día en que fue trasladado a dicha institución, José Gustavo sufrió de un fallo respiratorio producto *791 de una pulmonía bilateral interticiaria y otras condiciones, por lo que fue ingresado a la Unidad de Cuidado Intensivo Pediátrico del Hospital Regional de Ponce. Su estado de salud requería de un ventilador mecánico para respirar. Se le suministró un tratamiento agresivo de antibióticos y fue sometido a varios estudios, entre ellos, la prueba para la detección del viras del VIH. Esta última arrojó un resultado positivo.
Ante esta situación, el Hospital Regional de Ponce notificó a los padres de José Gustavo el resultado de las pruebas y les requirió que se realizaran una examen para detectar el viras. Ambos padres, así como los hermanos de José Gustavo, dieron negativo a la prueba para la detección del VIH en la sangre.
El 23 de noviembre de 1991, a saber, ocho (8) días más tarde, falleció José Gustavo. Su deceso ocurrió no sin antes sufrir la dolencia y pesadumbre que conlleva padecer dicha enfermedad. (Véase, Récord Médico de José Gustavo, Ap. XXXVII 228-762. De este documento, se desprende que el menor estaba ansioso, no tenía fuerzas, le daba mucha fiebre y dolor en el cuerpo). La autopsia practicada reveló que José Gustavo murió a causa de una bronconeumonía bilateral masiva producida por un microorganismo oportunista denominado pneumocystis carinnii, asociado con pacientes con el Síndrome de Inmunodeficiencia Adquirida (S.I.D.A.).
Así las cosas, los padres del menor instaron la presente acción. En la demanda alegaron, en síntesis, que las instituciones hospitalarias antes mencionadas habían atendido a José Gustavo cuando había padecido de varicelas hemorrágicas. En dos (2) de éstas, a saber, el Hospital Regional de Ponce y el Hospital Pediátrico de Río Piedras había recibido transfusiones de sangre y/o plaquetas. Plantearon que, a>la corta edad de once (11) años, José Gustavo no tenía una vida sexual activa y no había utilizado drogas intravenosas. Por consiguiente, descartando las fuentes de contagio señaladas, y en vista de que sus padres no tenían el viras, la única causa para el contagio de José Gustavo tenía que ser la negligencia o culpa del personal de las instituciones hospitalarias demandadas quienes al suministrarle sangre, plaquetas, suero y/o antibióticos contaminaron con el viras del VIH al menor. Lo anterior ocasionó que el menor padeciera la enfermedad del S.I.D.A. y posteriormente muriera.
Luego de los trámites procesales de rigor, el Tribunal de Primera Instancia emitió Sentencia Final Parcial desestimando la reclamación contra el Municipio de Ponce debido a que éste no era dueño ni controlaba ni administraba el Hospital Regional de Ponce. De igual modo, dictó Sentencia archivando la reclamación con perjuicio contra el Hospital Pediátrico de Puerto Rico y la Universidad de Puerto Rico. 
Trabada la controversia resultante, el tribunal a quo emitió el dictamen objeto de la presente apelación. En el mismo, declaró Con Lugar la demanda incoada e impuso responsabilidad al Hospital Regional de Ponce por la muerte de José Gustavo. En su consecuencia, condenó al Estado Libre Asociado de Puerto Rico a pagar la suma de $105,000 en concepto de daños y perjuicios.
Inconforme con el dictamen emitido, recurre ante nos el apelante. Contando con la comparecencia de los apelados, procedemos a resolver.
II
En su escrito, el apelante plantea que incidió el Tribunal de Primera Instancia en su apreciación de la prueba testifical y documental al determinar que a los donantes del Hospital Regional de Ponce no se le hicieron las pruebas serológicas correspondientes para determinar la presencia del viras del S.I.D.A.; y al concluir que el Hospital Regional de Ponce había actuado negligentemente al no realizarle la prueba de HTLV-III a las unidades de sangre adquiridas en otras facilidades hospitalarias, las cuales ya vienen procesadas, ni el examen retrospectivo de las unidades de sangre donadas.
III
Es norma claramente establecida por el Tribunal Supremo de Puerto Rico que en ausencia de error *792 manifiesto, pasión, prejuicio o parcialidad, no se intervendrá a nivel apelativo con las determinaciones de hechos y adjudicación de credibilidad hecha en instancia por el juzgador de los hechos. Argüello López v. Argüello García, 154 DPR_(2001), 2001 J.T.S. 127; Trinidad v. Chade, 153 D.P.R._(2001), 2001 J. T.S. 10; Quiñones v. Manzano, 141 D.P.R. 139 (1996); Orta v. Padilla, 137 D.P.R. 927 (1995); Vélez Reboyras v. Srio. de Justicia, 115 D.P.R. 529 (1984); Ortiz v. Cruz Pabón, c 103 D.P.R. 939 (1975); Rodríguez v. Concreto Mixto, Inc., 98 D.P.R. 579 (1970).
Un foro apelativo no puede descartar y sustituir por sus propias apreciaciones, basadas en un examen del expediente del caso, las determinaciones tajantes y ponderadas del foro de instancia. Argüello López v. Argüello García, supra. La determinación de credibilidad del tribunal sentenciador es merecedora de gran deferencia por parte del tribunal apelativo por cuanto es ese juzgador quien, de ordinario, está en mejor posición para aquilatar la prueba testifical desfilada, ya que él fue quien oyó y vio declarar a los testigos. Id; Pueblo v. Bonilla Romero, 120 D.P.R. 92, 111 (1987). El juez sentenciador, ante quien deponen los testigos, es quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, manerismos, dudas, vacilaciones y, por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad. Argüello López v. Argüello García, supra.
“[L]a declaración de un testigo no contradicho sobre un hecho determinado, debe merecer crédito, a no ser que su versión sea físicamente imposible, inverosímil o que por su conducta en la silla testifical se haga indigno de crédito”. Miranda Soto v. Mena Eró, 109 D.P.R. 473, 482 (1980); Alicea v. Sucn. F. Gil Rivera, 87 D.P.R. 789, 790 (1963); Villaronga, Com. v. Trib. de Distrito, 74 D.P.R. 331, 345 (1953).
Aunque de ordinario el foro apelativo rto interviene con la apreciación de la prueba que hacen los tribunales de instancia, sí lo hace cuando un balance racional, justiciero y jurídico de la totalidad de la prueba y de los documentos que obran en autos lleva a conclusiones distintas a las del tribunal de instancia. Negrón Rivera y Bonilla, Ex Parte, 120 D.P.R. 61 (1987).
Un tribunal apelativo no puede dejar sin efecto una sentencia cuyas conclusiones encuentran apoyo en la prueba desfilada. Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172, 181 (1985); Pérez v. Hospital La Concepción, 115 D.P.R. 721, 728 (1984). No obstante, está claro que el arbitrio del juzgador de hechos es respetable, mas no absoluto. Por eso, una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de un tribunal apelativo. Véase, Rivera Pérez v. Cruz Corchado, supra; Vélez v. Srio. de Justicia, 115 D.P.R. 533, 545 (1984).
En conclusión, reiteramos una vez más la norma fundamental de nuestro ordenamiento jurídico de que los tribunales apelativos, en ausencia de error, pasión, prejuicio o parcialidad, no deben intervenir con las determinaciones de hechos, la apreciación de la pmeba y las adjudicaciones de credibilidad realizadas por los tribunales de instancia. Trinidad García v. Chade, supra.
No obstante, en el ejercicio de su facultad revisora, el foro apelativo se encuentra en igual posición que el foro de primera instancia en cuanto a evaluar la prueba pericial y documental ofrecida. Es por ello que, en lo que respecta a dicha evidencia, está facultado a adoptar su propio criterio en la evaluación de la misma. En cuanto a la prueba pericial, el Tribunal Supremo ha expresado que como foro apelativo, no estamos obligados a seguir indefectiblemente “la opinión, juicio, conclusión o determinación de un perito o facultativo ... y que todo tribunal está en plena libertad de adoptar su criterio propio en la apreciación y evaluación de la prueba”. Culebra Enterprises Corp. v. E.L.A., 143 D.P.R. 935 (1997) (citando a Prieto v. Maryland Casualty Co., 98 D. P.R. 594 (1970)),(otras citas omitidas); Véanse, Dye-Tex Puerto Rico, Inc. v. Royal Insurance Company of Puerto Rico, 150 D.P.R._(2000), 2000 J.T.S. 67; Moreda v. Rosselli, 150 D.P.R._(2000), 2000 J.T.S. 69.
*793 IV
Dentro del marco jurídico enunciado, procedamos a dilucidar la presente controversia.
En su comparecencia, el apelante alega que el tribunal a quo incidió al determinar que existían grandes inconsistencias entre el número de unidades que el Hospital Regional de Ponce alegó haberles realizado la pmeba HTLV-HI y las unidades transfundidas a José Gustavo en dicha institución. Asimismo, plantea que erró el foro de instancia al concluir que el informe preparado por la tecnóloga médica, Leda, de Jesús Santos, estaba plagado de errores.
El apelante sostiene que la pmeba testifical, pericial y documental presentada estableció con claridad que a las unidades provenientes del Banco de Sangre del Hospital Regional de Ponce se les realizó la pmeba de HTLV-III, las cuales arrojaron un resultado negativo.
Por otro lado, en su dictamen, el cual adoptamos en su totalidad y lo hacemos formar parte de esta Sentencia, el Tribunal de Primera Instancia concluyó que el Hospital Regional de Ponce no había realizado las pruebas serológicas para determinar la presencia del vims HIV en la sangre donada y transfundida.
Comencemos señalando que hemos efectuado un detenido estudio y análisis de los récords del Hospital Regional de Ponce que obran en el expediente. Dicha evaluación nos produce serias dudas sobre lo aseverado por el apelante en su comparecencia. Veamos.
De entrada, queremos señalar que, en muy raras ocasiones, es posible determinar un hecho con certeza o exactitud matemática. Exigirle este tipo de pmeba al litigante equivaldría prácticamente requerirle un imposible. Por ello, la ley y la jurisprudencia se limitan a requerir que los casos se pmeben por preponderancia de pmeba, que es tanto como establecer como hechos probados aquéllos que con mayor probabilidad ocurrieron. Zambrana v. Hospital Santo Asilo de Damas, 109 D.P.R. 517 (1980).
Esbozado lo anterior, en el caso de autos somos de opinión que los apelados debían establecer lo siguiente: (1) que José Gustavo murió de S.I.D.A.; (2) que la fuente del contagio del VIH fue mediante transfusión de sangre y/o componentes contaminados; y (3) que la actuación negligente del personal del Hospital Regional de Ponce fue la causante del contagio de José Gustavo con VIH. Entendemos que desfiló pmeba suficiente para establecer los mismos.
A tales efectos, el Dr. Bemand Christenson declaró que no existía ningún factor de riesgo que pudiera explicar la infección de José Gustavo con el vims del VIH y su eventual fallecimiento por la enfermedad del SIDA. (i.e. uso de drogas intravenosas, actividad sexual, haber nacido con la condición), salvo las transfusiones de componentes sanguíneos potencialmente infectados con VIH.
Concluyó el facultativo que la única posibilidad de contagio de José Gustavo lo era a través de una transfusión de sangre o componentes sanguíneos. El facultativo asegura que antes de morir, José Gustavo tenía SIDA. Señala que la autopsia así mismo lo confirma. Explicó que una vez infectada la persona con VIH, el promedio de manifestación de la enfermedad es de siete (7) años. Cuando la infección se da por transfusiones de componentes sanguíneos la presencia del viras en la sangre es mayor. Es por esto, que el contagio de José Gustavo con el VIH es compatible con las transfusiones recibidas en el 1986.
Añadió el perito que el historial médico de José Gustavo demuestra que el niño no recibió transfusiones de sangre o sus componentes en ningún otro momento de su vida, ni antes ni después del 26 de junio al 6 de julio de 1986. Por consiguiente, sólo había dos (2) posibles fuentes de contagio, a saber, las transfusiones recibidas en el Hospital Regional de Ponce y la del Hospital Pediátrico.
*794 El Dr. Bemand Christenson opinó que la unidad de PRBC, número 54F90411 que José Gustavo recibió del Hospital Pediátrico era descartable como componente sanguíneo infectado. A dicha unidad, se le realizaron las pruebas de VIH, se llevó el correspondiente examen retrospectivo (“Look Back Study”) dando un resultado negativo. Es decir, que al presente se le practicó una prueba de detección del VIH al donante y su resultado fue negativo. Por lo cual, no puede considerarse al Hospital Pediátrico como posible fuente de contagio.
A tales efectos, la única posibilidad restante de contagio lo era el Hospital Regional de Ponce. Sobre el particular, el perito declaró que del récord médico de José Gustavo se desprende que le transfundieron con plaquetas en más de cincuenta y seis (56) ocasiones en el Hospital Regional de Ponce. Indicó que ninguno de los récords examinados reflejaban que se examinaron y procesaron las pruebas de VIH a las unidades transfundidas. Añadió que ningún documento dentro del récord médico demostraba que se le habían realizado las pruebas de HIV a los componentes o a los donantes. De igual manera, testificó que no había información que demostrara que el Hospital Regional de Ponce hiciera el “Look Back Study” a las unidades de plaquetas transfundidas a José Gustavo. A tales efectos, testificó que no todos los componentes de plaquetas que fueron transfundidos a José Gustavo tenían los resultados de la prueba de VIH. Aproximadamente cinco (5) de las unidades no tenían la información de que eran seropositivas o seronegativas porque estas unidades en cuestión fueron obtenidas de otro Hospital (el Hospital de Damas). A preguntas del abogado de los apelados, declaró que la confiabilidad del informe por la tecnóloga médica, Leda. Ana de Jesús, en lo referente a las unidades de componentes sanguíneos transfundidos a José Gustavo era muy pobre. Entendía que era inaceptable como fuente para basar su opinión la presentación de una fotocopia de un escrito redactado a manuscrito en donde se desglosaban los resultados de las pruebas serológicas realizadas a las unidades transfundidas. Añadió que lo ideal era la presentación del “work sheet” del Laboratorio Clínico del Banco de Sangre del Hospital Regional de Ponce o los libros que documentaban la realización de las pruebas, debidamente certificados por el Departamento de Salud, acreditando que las pruebas fueron hechas y cuál había sido su resultado.
Es evidente que el tribunal a quo le otorgó credibilidad al testimonio pericial presentado por los apelados al concluir que el Hospital Regional de Ponce había sido negligente en el manejo de las plaquetas transfundidas a José Gustavo.
El apelante plantea que, tratándose de prueba de naturaleza pericial, este Tribunal está en la misma posición que el Tribunal de Primera Instancia para evaluar la misma. Dye-Tex Puerto Rico, Inc. v. Royal Insurance Company of Puerto Rico, supra, 150 D.P.R. _ (2000), 2000 J.T.S. 67, a la pág. 934; véase, además, Culebra Enterprises Corp. v. Estado Libre Asociado, supra (tribunal goza de facultad para descartar la opinión del perito).
Reconocemos que tenemos esa facultad. No obstante, no percibimos base para ejercitar la misma y sustituir el juicio del Tribunal de Primera Instancia en el presente caso. La ponderación de la prueba realizada por dicho foro, en este sentido, nos parece razonable y coincidimos enteramente con la misma.
Entendemos que la negligencia del Hospital Regional de Ponce no sólo puede deducirse del testimonio del perito de los apelados sino, que la misma puede constatarse en la evidencia presentada por las partes.
Nótese que surge del recurso ante nuestra consideración (véase, Contestación a Interrogatorio, Ap. IX, p. 77-78) que el Hospital Regional de Ponce declaró que José Gustavo estuvo recluido en dicha institución desde el 29 de junio al 4 de julio de 1986, fecha en que fue trasladado al Hospital Pediátrico de Puerto Rico. Durante este período, se le transfundieron plaquetas de sangre al menor todos los días. En aquella ocasión, el apelante detalló las unidades transfundidas de la siguiente manera: 88919, 88918, 88923, 88930, 88920, 88921, 88922, 88927, 88933, 88924, 88915, 88917, 88907, 88903, 88906, 88897, 88902, 88901, 88896, 88898, 88899, 88894, 88900, 88862, 88853, 88848, 88863, 88891, 88893, 88874, 88875, 88878, 88876, 88868, 88868, 88852, 88864, 88865, 88873, 88870, 56578, 56575, 56571, 56580, 56569, para un total de cuarenta y cuatro (44) unidades *795 transfundidas. (Observamos que la unidad 88868 fue repetida por el apelante en su contestación al Interrogatorio). Sin embargo, surge del Record of Blood Transfunsion presentado por el propio Hospital Regional de Ponce (Véase, Ap. XXXII, p. 184-197) que se le transfundieron al menor cincuenta y dos (52) unidades de plaquetas.
A saber, el 29 junio de 1986 se le transfundieron las unidades 88862, 88853, 88848, 88863, 88852, 88864,88865, 88873, 88876, 88868; el 30 de junio de 1986, las unidades 88879, 88875, 88878, 88891, 88893, además de las unidades provenientes el Hospital de Damas identificadas como: 56570, 56578, 56575, 56571, 56580, 56569; el 1 de julio de 1986, las unidades, 88901, 88898, 88899, 88897, 88894. Deseamos puntualizar que, respecto a estas unidades, el récord del Hospital Regional de Ponce presenta una seria contradicción. Conforme la información contenida en éste, el técnico del Banco de Sangre acreditó que fueron extraídas cinco (5) unidades de plaquetas (88901, 88898, 88899, 88897, 88894) para ser transfundidas a José Gustavo. Sin embargo, la enfermera que administró la transfusión certificó haber transfundido las unidades 88901, 88898, 88899 y 8884, para un total de cuatro (4) unidades. Nótese la discrepancia en las unidades 88897 y 88894. Asimismo, el 2 de julio de 1986, el récord médico resulta también impreciso y debe mencionarse que está lleno de tachaduras; no obstante, revela con claridad que le fueron transfundidas ese día dos (2) unidades a José Gustavo, la 88890 y la 88900; el 3 de julio de 1986, las plaquetas 88903, 88906, 88897, 88902, 88896; la 88829, 88915, 88917, 88924, 88907. Esta hoja del récord nos provoca serias dudas sobre la corrección y diligencia con que el personal del Hospital Regional de Ponce manejó la transfusión de sangre al paciente. En primer lugar, la misma señala que se le transfundirían al menor seis (6) unidades, a pesar de que se observa un número siete (7) antepuesto. En segundo término, al detallar las unidades incluye, a pesar de que fueron tachadas, dos (2) unidades: la 88816 y la 88814. Por último, la hoja del récord, al que hacemos alusión, fue duplicada manualmente, sin que la técnica del Hospital Regional de Ponce ofreciera una explicación satisfactoria al respecto (véase, ESP a la pág. 18) dado que los errores anteriormente señalados fueron reproducidos. Finalmente, el 4 de julio de 1986, se le transfundieron las unidades 88919, 88918, 88923, 88930, 88920, 88921, 88922, 88927 y 88933.
Es ostensible que existen serias inconsistencias en el récord médico del Hospital Regional de Ponce que sustentan la determinación del foro de instancia al imputarle negligencia. Nótese, además, que el 2 de julio se ordenó la transfusión de cinco (5) unidades de plaquetas; aparentemente las mismas fueron despachadas del Banco de Sangre, pero alegadamente sólo dos (2) fueron transfundidas (88900 y 88890, ver Ap. XXXII, a la pág. 190). Es necesario destacar que el récord revela una serie de plaquetas cuya identificación no alcanzamos a comprender por estar tachadas o alteradas. Más aún, en la Contestación a Interrogatorio del Estado, el apelante omite divulgar que la unidad 88890 fue transfundida a José Gustavo; sin embargo, sí incluyó la unidad 88900. De igual modo, se omitió mencionar en el interrogatorio la unidad 88879. Por el contrario, surge del interrogatorio que se transfundió la unidad 88874; sin embargo, no existe ningún récord que demuestre que se trasfundiera la misma.
Asimismo, y a nuestro entender de naturaleza grave, no existe récord que revele que se le hubiese practicado prueba serológica alguna a la unidad de plaqueta identificada con la numeración 88901. De igual manera, surge del informe de la tecnóloga médica, licenciada de Jesús, que las unidades 88875, 88878, 88879, 88880, 88881 y 88882 fueron sometidas a una segunda prueba serológica. No surge del informe porqué se ordenó la repetición de la prueba. Es decir, si fue porque el primer laboratorio se echó a perder o porque la primera prueba arrojó algún tipo de resultado positivo. Sobre el particular, nos referimos a lo declarado por la licenciada de Jesús a los efectos de que si una unidad arroja un resultado seropositivo la prueba se repite, si el resultado vuelve a ser positivo la prueba se incinera porque está infectada con el virus. Las unidades 88875, 88878 y 88880 fueron efectivamente transfundidas a José Gustavo sin que surja del registro del Hospital Regional de Ponce cuál fue el resultado de la pmeba serológica para dichas unidades, ni si se realizaron las mismas.
*796 Es, pues, forzoso concluir que la prueba presentada ampliamente demostró que el Hospital Regional de Ponce fue negligente en el manejo de las unidades de sangre transfundidas a José Gustavo y que dicha negligencia fue con mayor probabilidad la causante del contagio del menor con VIH y de su posterior muerte por SIDA. La falta casi total de credibilidad que nos merecen los récords médicos presentados en evidencia, sustentan nuestra determinación de confirmar al Tribunal de Primera Instancia.
El apelante aduce como segundo error del tribunal a quo concluir que el Hospital Regional de Ponce había actuado negligentemente al no realizarle nuevamente la prueba de HTLV-III a las unidades de sangre adquiridas en otras facilidades hospitalarias. Respecto a este señalamiento de error, sólo resta mencionar que el foro de instancia no basó la determinación de negligencia únicamente en las unidades procedentes del Hospital de Damas; las incongruencias en el récord de las unidades provenientes del Banco de Sangre del Hospital Regional de Ponce son por si suficientes para sustentar el fallo del Tribunal de Primera Instancia.
V
Por los fundamentos antes esbozados, se Confirma la Sentencia apelada.
Lo acordó y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau Secretaria General
ESCOLIOS 2003 DTA 25
1. Cabe destacar que en cuanto a las unidades transfundidas hubo evidencia conflictiva ante el tribunal a quo. Surge de la Sentencia apelada que en la deposición tomada a la tecnóloga médica del Hospital Regional de Ponce, Leda. Ana Julia De Jesús Santos, ésta manifestó que a José Gustavo se le habían transfundido cincuenta y seis (56) unidades de sangre o componentes de sangre. Mientras que en el informe que ésta realizara de acuerdo con la información contenida en el Libro de Donantes surge que fueron cuarenta y cinco (45) unidades las transfundidas. No obstante, el récord médico del paciente revela que se le transfundieron cincuenta y dos (52) unidades.
2. Surge del recurso que José Gustavo fue monaguillo durante los tres (3) años anteriores a su muerte.'
3. La parte apelada desistió de la reclamación contra el Hospital Pediátrico de Puerto Rico y la Universidad de Puerto Rico, debido a que su perito, el Dr. Bernand Christenson, concluyó que la transfusión realizada a José Gustavo en el Hospital Pediátrico de Puerto Rico, identificada con el número 54F90411 no estaba infectada con el virus que causa el S.I.D.A. Esta determinación encuentra apoyo en un estudio retrospectivo “Look Back Study” realizado por el perito el cual revela que al presente el donante no está infectado con el V.I.H.
4. Ver Exposición Narrativa de la Prueba, págs. 3-6.
5. Véase Exposición Narrativa de la prueba, p. 5.