Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL I

| | | |
|---|---|---|
| ROBERTO AVILA RIVERA ET AL<br>Parte Apelante<br><br>v.<br><br>PUERTO RICO TELEPHONE COMPANY, INC. T/C/C CLARO DE PUERTO RICO ET AL<br>Parte Apelada | TA2025AP00106 | Apelación procedente del Tribunal de Primera Instancia, Sala de Fajardo<br><br>Civil Núm.: NSCI201200703<br><br>Sobre: Reivindicación |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio y el Juez Rodríguez Flores

Rodríguez Flores, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 10 de septiembre de 2025.

El 12 de mayo de 2025, el Tribunal de Primera Instancia (TPI, foro primario o foro apelado), Sala Superior de Fajardo, pronunció una *Sentencia Sumaria*, notificada y archivada en autos el 14 de mayo de 2025.[1] Mediante esta determinación, el foro primario declaró *ha lugar* a la solicitud de sentencia sumaria presentada por el Municipio de Ceiba (Municipio),[2] la cual fue avalada por la Puerto Rico Telephone Company (PRTC) (en conjunto, apelados),[3] y refutada por los apelantes.[4] Consecuentemente, el TPI desestimó la causa de acción de epígrafe presentada por el señor Roberto Ávila Rivera (señor Ávila), la señora Casilda Alicea Lozada (señora Alicea) y la Sociedad Legal de Gananciales (SLG) constituida por ambos (en conjunto, apelantes) contra los apelados.

---

[1] *Sentencia Sumaria*, SUMAC-TA, entrada 1, apéndice II.
[2] *Moción de Sentencia Sumaria*, *Íd.*, apéndice XX.
[3] *Respuesta de PRTC en Apoyo de Moción de Sentencia Sumaria y Sometiendo Hechos Adicionales Que No Están en Controversia*, *Íd.*, apéndice XXII.
[4] *Oposición a Sentencia Sumaria del Municipio de Ceiba y Moción en Apoyo de Sentencia Sumaria de PRTC*, *Íd.*, apéndice XXIII.

Mediante el recurso de apelación incoado el 9 de junio de 2025,[5] el señor Ávila y la señora Alicea solicitan que revoquemos la *Sentencia Sumaria* y que ordenemos la celebración de un juicio debido a que, a su entender, no se cumplieron con los requisitos legales para la afectación del dominio sobre el terreno disputado, por lo cual no había una finca enclavada y tampoco aplicarían las demás doctrinas adaptadas al caso en el foro primario.

El 8 de julio de 2025, PRTC presentó su *Alegato en Oposición a la Apelación.*[6]

El 15 de agosto de 2025, el Municipio presentó su *Alegato del Municipio de Ceiba.*[7]

Examinados los escritos a la luz del derecho aplicable y por los fundamentos que expondremos a continuación, se *confirma* la *Sentencia Sumaria* apelada.

## I.

El 9 de octubre de 2012, el señor Ávila y la señora Alicea presentaron una *Demanda* contra la PRTC.[8] Arguyeron que, en 1998, PRTC ocupó, sin su conocimiento o consentimiento e ilegalmente, parte de su finca en Ceiba e instaló unos postes de madera; alegaron además que no habían sido remunerados por la utilización ilícita de su propiedad.

Luego de varios trámites procesales que son innecesarios pormenorizar, el 14 de mayo de 2014, el Municipio presentó una certificación que, en síntesis, perfilaba que, aunque no hubo una acción específica para la transferencia de la propiedad al ente gubernamental, el terreno se consideraba como suyo hace un tiempo considerable.[9]

---

[5] *Íd.*, entrada 1.
[6] *Íd.*, entrada 3.
[7] *Íd.*, entrada 6.
[8] *Íd.*, entrada 1, apéndice II.
[9] *Certificación*, SUMAC en el caso NSCI201200703, entrada 6, anejo VI.

Entonces, el 26 de marzo de 2018, los apelantes radicaron una tercera *Demanda Enmendada*.[10] En esta, incluyeron como codemandado al Municipio. Además, alegaron que la PRTC enclavó ilegalmente los postes, por lo cual le correspondía indemnizar la cantidad dineraria de $1,266,147.02, computada desde 1998. Asimismo, debería satisfacer un monto mensual de $7,541.30 por concepto de arrendamiento.

En respuesta a esto, el 7 de junio de 2018, la PRTC negó las alegaciones de los apelantes y argumentó que los postes instalados son importantes para el funcionamiento de las telecomunicaciones, lo cual se considera un servicio esencial.[11] Asimismo, adujo que el camino pavimentado contiguo a la zona de seguridad enclavada se convirtió en un bien de dominio público debido al uso que se les daba a esas partes del terreno; es decir, se convirtió en un bien de dominio público mediante la afectación. Por último, levantó las defensas afirmativas de la prescripción, la incuria y la doctrina de las manos sucias.

Similarmente, el 3 de agosto de 2018, el Municipio contestó la *Demanda Enmendada*.[12] Allí, negó todo lo alegado por los apelantes.

El 27 de junio de 2019, el Municipio presentó una demanda contra coparte y reconvención.[13] Mediante ella, el Municipio le reclamó a la PRTC por concepto de rentas y servicios dejados de pagar. Además, arguyó que el demandante debía satisfacer las cuantías recibidas por concepto de rentas y contratos de arrendamiento.

El 1 de noviembre de 2021, el Municipio presentó una *Moción de Sentencia Sumaria Parcial*.[14] En esencia, sostuvo que procedía que: (1) el foro primario declarara que el camino

---

[10] *Demanda Enmendada, Íd.*, entrada 1.
[11] *Contestación a [la] Tercera Demanda Enmendada, Íd.*, entrada 13.
[12] *Contestación a [la] Demanda Enmendada, Íd.*, entrada 14.
[13] *Demanda contra Co-parte, Íd.*, entrada 17.
[14] *Moción de Sentencia Sumaria Parcial, Íd.*, entrada 20.

pavimentado era de dominio público; (2) avalara el hecho de que el Municipio es quien tenía el derecho a cobrar por la utilización de la zona de seguridad de la calle rural; (3) estableciera que los apelantes han estado cobrando ilegalmente por los postes sin tener derecho a ello, y (4) dictaminara que estos debían responderle económicamente al ente gubernamental por enriquecimiento injusto y por actuar temerariamente.

A su vez, el 22 de noviembre de 2021, la PRTC presentó una moción en apoyo a la solicitud de sentencia parcial incoada.[15] Esta contenía una breve exposición de hechos adicionales que tampoco estaban en controversia.

El 21 de diciembre de 2021, el señor Ávila y la señora Alicea radicaron su *Oposición a Sentencia Sumaria del Municipio de Ceiba y Moción en Apoyo de Sentencia Sumaria de PRTC*.[16] Alegaron que el camino rural que pasaba por su propiedad no era vecinal, sino que era de naturaleza privativa y que, incluso, el Municipio pidió permiso para pavimentarlo. Asimismo, sostuvieron que no existía una zona de seguridad y que el área sobre la cual se colocaron los postes les pertenecía. Por ello, le solicitaron al foro primario que denegara el petitorio del Municipio.

El 24 de febrero de 2025, se celebró una vista para considerar las mociones presentadas.[17]

Así, el 12 de mayo de 2025, el foro primario dictaminó una *Sentencia Sumaria* mediante la cual declaró *ha lugar* a la solicitud de sentencia sumaria incoada por el Municipio junto con las adiciones de la PRTC y, consecuentemente, desestimó la causa de acción del caso de epígrafe en su totalidad.[18] Tras evaluar las

---

[15] *Respuesta de PRTC en apoyo de [la] Moción de Sentencia Sumaria y Sometiendo Hechos Adicionales que No Están en Controversia, Íd.*, entrada 22.
[16] *Oposición a Sentencia Sumaria del Municipio de Ceiba y Moción en Apoyo de Sentencia Sumaria de PRTC, Íd.*, entrada 23.
[17] *Minuta, Íd.*, entrada 27.
[18] *Sentencia Sumaria, Íd.*, entrada 2.

peticiones y los documentos acompañados, el foro apelado procedió a formular las siguientes determinaciones de hechos:

1. La parte demandante de epígrafe, Roberto Ávila Rivera y Casilda Alicea Lozada, son mayores de edad, casados entre sí, por tanto, constituyen una Sociedad Legal de Gananciales, que es también demandante en este caso y, vecinos de Guaynabo, PR, cuya dirección postal es: Apartado 11613, San Juan, Puerto Rico 00910-2713, teléfono: 787-731-0678.

2. El 8 de agosto de 1966, la parte demandante adquirió junto al Sr. José M. Santiago la finca que es objeto del litigio a los esposos Monserrate Rivera Rosado y Juanita Casanova, por medio de la Escritura Núm. 122 de 8 de agosto de 1966, otorgada por el Notario Alejo Rivera Morales, en Fajardo, Puerto Rico. La parte demandante era dueña de dos terceras (2/3) partes y el Sr. José M. Santiago Ríos, era dueño de la otra tercera (1/3) parte.

3. Por medio de la Escritura de Cesión de Derecho y Acciones Núm. 2, del 30 de enero de 1976, el Sr. Santiago Ríos vendió a la parte demandante su participación de una tercera (1/3) parte en la finca.

4. La parte demandante es dueña en pleno dominio de una finca sita en los Barrios Chupacallos y Saco del Municipio de Ceiba, la cual, según la escritura[,] tiene cuarenta y dos cuerdas, inscrita en el Registro de la Propiedad de Humacao, al Folio 80 del Tomo 20 de Ceiba, finca número 332, inscripción octava.

5. La descripción registral de la finca según reza el Contrato de Compraventa en su cláusula primera es la siguiente:

   "R[Ú]STICA: Radicada en los barrios Chupacallos y Saco del término municipal de Ceiba, compuesta de cuarenta y dos cuerdas, en lindes por el Norte, con la Quebrada de la Ceiba, don Francisco Romero y don Práxedes Rosario, por el Sur, con don Pedro Cruz, hoy Juan Cruz Burgos, don Ángel Ramos, hoy Eduardo Arias y don Juan Román, hoy Juan Cruz Burgos; por el Este con la Sucesión Fuentefría y don Jesús Piñero, hoy Sucesión de don José Carreras y por el Oeste, con don Trinidad Quiñones y don Etanislao Alvira. Inscrita en el Registro de la Propiedad de Humacao, al Folio ciento cuarenta y uno del Tomo nueve de Ceiba, finca número trescientos treinta y dos, inscripción sexta."

6. En la copia certificada de la escritura, el Registrador hizo constar que la finca se inscribió en cuanto a 38.45 cuerdas.

7. Originalmente, la finca era dedicada al cultivo de caña de azúcar.

8. Existía un camino de tierra que transcurría por el medio de la finca y que era utilizado para bajar carretones de caña hasta el lugar donde era colocada en los vagones que la transportaban a la central.

9. Durante su niñez, el Sr. Ávila utilizaba el camino, al igual que otros vecinos del área, para desplazarse de un punto a otro y buscar frutos.

10. Para el año 1986, el alcalde de Ceiba, Sr. Gilberto Lex Camacho Padilla, le solicitó permiso a la parte demandante para embrear el camino de tierra que discurre por la finca, y la parte demandante lo autorizó.

11. El camino fue asfaltado con la autorización y permiso de la parte demandante.

12. El camino también era utilizado por los vecinos del área para desplazarse entre el sector Quintas de Ceiba y el pueblo.

13. En el 1988, como parte de un proyecto para desarrollar solares en una parte de la finca que colinda con el camino, la parte demandante [le] solicitó al Ing. Orlando Fuentes un plano de mensura.

14. La parte demandante [le] solicitó al Ing. Orlando Fuentes que en el plano de mensura para dividir los solares se denominara el camino que discurriría por su finca como un "camino municipal", dado que, como parte de la lotificación de solares, la parte demandante pensaba donar el camino al Municipio de Ceiba.

15. Luego de comenzado el desarrollo de los solares, las lluvias del Huracán Hugo que pasó por Puerto Rico en septiembre de 1989, profundamente alteraron la topografía de los terrenos de la finca, por lo que, la parte demandante no pudo continuar con la lotificación de los solares y paralizó el proyecto y descartó la idea de donar el camino al Municipio de Ceiba.

16. Después del paso del Huracán Georges en septiembre de 1998, la parte demandante visitó la finca y notó que a lo largo del camino se habían hincado unos postes de madera con tensores, y que en dichos postes había cables de comunicación telefónica y que dichos postes pertenecían a la PRTC.

17. El terreno que la parte demandante alega ser privativamente suyo es una porción de la totalidad de la finca.

18. Después [de] que se asfaltó el camino en la finca del demandante, el Municipio de Ceiba ocasionalmente ha dado mantenimiento a la carretera.

19. Desde que se asfaltó el camino en la finca del demandante, el Municipio de Ceiba ocasionalmente ha reparado daños en la carretera ocasionados por lluvias u otros fenómenos.

20. PRTC es una corporación con fines de lucro [*sic*] autorizada a hacer negocios en el Estado Libre Asociado de Puerto Rico, cuya dirección es 1515 Ave. Roosevelt, Guaynabo, PR 00968, la cual se dedica al negocio de comunicaciones.

21. PRTC y Centennial (hoy AT&T) tienen 20 postes instalados en los costados paralelos con la porción del camino que transcurre por el medio de la finca de la parte demandante.

22. De los 20 postes, 11 pertenecen a PRTC y 9 a Centennial. [Esto fue modificado luego de una vista].

23. Los postes instalados por PRTC y Centennial tienen marcas hechas en relieve que los identifican como propiedad de PRTC y de Centennial.

24. Centennial fue adquirida por AT&T.

25. AT&T y SBA arriendan de la parte demandante, mediante contrato, dos predios donde estas compañías colocaron torres de telecomunicaciones.

26. El predio donde ubican las torres de telecomunicaciones pertenece al demandante y es parte de su finca.

27. AT&T [y] SBA pagan a la parte demandante un canon mensual por dichos arrendamientos.

28. PRTC tiene equipos colocados en la torre de SBA y paga un canon de renta a SBA.

29. En la torre de SBA[,] también hay equipos de otras compañías de celulares tales como Sprint y T-Mobile.

30. En la zona de seguridad ubicada a los costados de la porción del camino que discurre por la finca de la parte demandante[,] hay trece (13) postes de madera hincados por los cuales discurren cables de telecomunicaciones.

31. Por los postes[,] discurren tres (3) cables de telecomunicaciones.

32. Actualmente[,] hay dos (2) postes identificados con signos que indican "PRTC".

33. En la zona[,] también hay nueve (9) postes identificados con signos que indican que los postes pertenecen a Centennial (actualmente AT&T) o a AT&T.

34. Hay dos (2) postes que no están identificados o cuya identificación se borró con el paso del tiempo, por lo que no se puede discernir a quién pertenecen.

35. Los cables provienen del área camino abajo y suben hasta tomar un giro hacia el camino de tierra que conduce a las dos torres de telecomunicaciones ubicadas en la finca de la parte demandante.

36. El propósito de los cables es dar servicio a las antenas de telecomunicaciones ubicadas en la finca del demandante puesto que no hay ninguna casa ubicada en la finca del demandante y los cables no continúan camino arriba hacia el barrio Las Quintas.

37. En la zona de seguridad de la porción del camino en controversia[,] también se encuentra cuatro (4) registros de cemento por los que se aparenta tener acceso a cables soterrados de AT&T (ahora Liberty). Aparte de la estructura de cemento con tapas de cemento que indican "AT&T" también hay unos tubos de PVC con punta anaranjada que leen "Liberty underground cable".

38. El demandante [*sic*] y el Hon. Gilberto Camacho [Parrilla], exalcalde del Municipio de Ceiba, recordaron que, de niños, el camino se utilizaba para el cultivo de caña, particularmente [como] vía para los vagones que cargaban la caña hacia la central.

39. El Hon. Gilberto Camacho [Parrilla] fue alcalde de Ceiba para los términos [de] 1985-1992 y 2003-2008. Nació en el año 1950.

40. Antes de 1986, la vía era utilizada por un grupo de vecinos como único medio de llegar al centro de salud que quedaba en barrio pueblo.

41. Antes de 1986, la vía era utilizada por los vecinos de la [c]alle José E. Romero, del sector pueblo de Ceiba, para buscar frutos.

42. La vía era transitada mayormente [por] gente a caballo, aunque uno que otro tenía automóvil.

43. El Sr. Félix Barreto fue secretario municipal bajo la administración de la exalcaldesa Hon. Irma Pedraza de Ortiz (1993-1997) y del exalcalde Hon. Ángelo Cruz Ramos (2013-2021). Nació en el año 1967.

44. En la niñez del Sr. Félix Barreto[,] el camino lo utilizaban a diario distintas personas a pie, [en] bicicleta, a caballo [*sic*] e[,] incluso[,] en vehículo.

45. De niño, el Sr. Félix Barreto fue de esas personas que cruzaban el camino a pie o en bicicleta.

46. Para el año 1986, cuando el Hon. Gilberto Camacho Parrilla juramentó como alcalde en su primer término, un grupo de vecinos se acercaron a él para solicitarle que mejorara las condiciones del camino vecinal que entre su todo incluye un tramo en la propiedad del demandante y otro tramo más largo en terrenos de otros individuos.

47. Estos vecinos eran del sector conocido como "Las Quintas", el cual tiene parte en el barrio Saco y parte en el barrio Chupacallos.

48. El camino, por estar en [una] pendiente, era susceptible a las corrientes pluviales [*sic*] que ocasionaban zanjones de tierra.

49. Además, el terreno era bien inestable, y los caminos que ya habían sido asfaltados en "Las Quintas" se habían derrumbado y por esta razón entonces es que tienen que venir los vecinos de toda esa área y bajar por el camino en la finca del demandante.

50. No existe controversia sobre la localización o identificación del camino en controversia.

51. El Sr. Félix Barreto proporcionó un mapa provisto por la Oficina de Planificación del Municipio.

52. El mapa fue debidamente marcado por el Sr. Félix Barreto en cuanto a lo que el Municipio considera el camino "Las Quintas" y la porción de este camino en la finca del demandante. También[,] marcó el área que el Municipio considera como el Sector Las Quintas.

53. Cuando el exalcalde Hon. Camacho Padilla [recibió] la solicitud de los vecinos para mejorar el camino, no conocía a los dueños de los terrenos por los cuales discurría la totalidad del camino público de Las Quintas, con excepción del demandante.

54. El exalcalde Hon. Camacho Padilla conocía al demandante por tener una prima hermana en común, la [s]eñora María Parrilla Ávila, y también porque existía una relación estrecha entre su entonces vicealcalde Sr. José Enrique García Cruz y la familia Ávila.

55. En las palabras del exalcalde[,] "[t]uvimos una reunión entonces con el señor Ávila y él accedió a que se hicieran las mejoras al camino".

56. El desconocimiento o la falta de consentimiento de los otros dueños no fue impedimento para que el Municipio mejorara el camino en su totalidad y [lo] asfaltara en 1986, utilizando brigadas del Municipio

[*sic*] en un trabajo que tomó aproximadamente tres (3) meses.

57. Los trabajos consistieron en rellenar zanjones, tratar de buscarle un curso a las aguas pluviales para que no interfirieran tanto con el camino, y luego asfaltar.

58. El exalcalde Hon. Camacho Padilla no pudo precisar desde cuándo se ha asfaltado el camino con fondos municipales, pero sí que[,] cuando su administración intervino en 1986[,] había parchos de [asfalto] deteriorados.

59. El Sr. Félix Barreto tampoco pudo precisar fecha, pero de niño recuerda haber visto el camino con asfalto.

60. Luego del asfaltado de 1986, el camino público se ha mantenido en existencia y en uso.

61. El camino conocido como "Las Quintas" fue identificado mediante métodos confiables en coordenadas Lambert de extremo a extremo por el técnico de la Oficina de Planificación del Municipio, el señor Efraín Hern[á]ndez Carrasquillo.

62. El señor Efraín Hern[á]ndez Carrasquillo compaginó una serie de fotos aéreas satelitales históricas del camino público que demuestra[n] la existencia ininterrumpida del camino público asfaltado por más de 20 años de historia, desde 1994 hasta el presente, con fotos aéreas satelitales del 23 de noviembre de 1994, del 30 de enero de 2004, del 23 de septiembre de 2005, del 29 de noviembre de 2006, del 21 de septiembre de 2009, del 22 de febrero de 2011, del 29 de agosto de 2012, del 6 de mayo de 2013 y del 5 de mayo de 2014.

63. De las fotos satelitales[,] se puede apreciar que el camino sigue siendo el mismo.

64. La longitud de la porción del camino Las Quintas que discurre por la finca del Demandante es 1,911.36538 pies de la totalidad del camino Las Quintas.

65. Para el año 1994[,] con la exalcaldesa Hon. Irma Pedraza de Ortiz[,] se realizaron trabajos de repavimentación y ensanche bajo el contrato otorgado el 14 de noviembre de 1994.

66. Bajo dicho contrato[,] el Municipio gastó $31,854.24 en el camino Las Quintas.

67. El 17 de junio de 2009[,] se otorgó un contrato entre el Municipio y la compañía Beginners General Contractor el cual trataba precisamente de la

repavimentación, construcción de badenes y [cunetas] en el camino en el camino en cuestión.

68. El propio contrato desglosa que el Municipio gastó en dos tramos en "Las Quintas" $97,890.08 y $5,883.52 en el camino "Las Quintas".

69. El 25 de abril de 2011[,] se otorgó un contrato entre el Municipio y Beginners General Contractor para [la] realización de obras públicas en el camino Las Quintas.

70. El propio contrato desglosa que el Municipio gastó $17,026.68 en el camino Las Quintas.

71. De los documentos[,] se puede apreciar que el Municipio ha mejorado el camino de distintas formas, con [la] construcción de aceras, [cunetas] y asfaltado, [el] mantenimiento de sus áreas verdes, desyerbo y bordeado del camino, utilizando equipo y brigadas del Municipio.

72. La importancia de darle mantenimiento al camino versa en que "el camino público es bien oscuro y peligroso de noche, por lo cual el Municipio siempre intenta lo más que puede mantener las áreas verdes para evitar accidentes".

73. Por otro lado, el Sr. Clemente, con la ayuda de la entonces directora de Obras Públicas del Municipio, la señora Aniris Ávila Jiménez, bajo sendas declaraciones[,] estimaron que la oficina de Obras Públicas Municipales bajo la administración del Alcalde anterior (2013-2020) gastó la cantidad aproximada de $10,367.50 por año en concepto de los salarios de los empleados municipales y el costo de reemplazo de los equipos utilizados para el mantenimiento, reparaciones y limpieza del camino de Las Quintas.

74. El Municipio presentó al menos diez (10) contratos que identificaban la realización de obras públicas en el mencionado camino público. Estos son: Contrato 95-43 del 14 de noviembre de 1994; Contrato 2009-000154 de 17 de junio de 2009; Contrato 2011-000156 del 25 de abril de 2011; Contrato 2018-000108 del 21 de septiembre de 2017; Contrato 2018-000116 del 19 de enero de 2018; [*sic*] Contrato 2018-000117 del 19 de enero de 2018; Contrato 2018-000118 del 19 de enero de 2018; Contrato 2018-000119 del 19 de enero de 2018; Contrato 2018-000125 del 5 de febrero de 2018.

75. Acontecidos los Huracanes Irma y María, el Municipio, con sus empleados municipales[,] llevaron a cabo sendos trabajos de limpieza para reestablecer el tránsito en el camino público.

76. A su vez, se contrataron a compañías privadas [para] que se encargaran del recogido de los escombros respectivamente.

77. El Municipio otorgó los siguientes contratos de recogido, acarreo y disposición de escombros con empresas privadas: Contrato 2018-000108 del 21 de septiembre de 2017; Contrato 2018-000109 del 21 de septiembre de 2017; Contrato 2018-000116 del 19 de enero de 2018; Contrato 2018-000117 del 19 de enero de 2018; Contrato 2018-000118 del 19 de enero de 2018; Contrato 2018-000119 del 19 de enero de 2018; Contrato 2018-000125 del 5 de febrero de 2018.

78. El Municipio ha gastado en el camino "Las Quintas"[,] por concepto de recogido, acarreo y disposición de los escombros producidos por el Huracán María[,] la cantidad total de $177,526.50.

79. El Municipio, a través de su Auditor Interno, realizó investigaciones para identificar los daños causados por el Huracán María para coordinar los trabajos con FEMA y COR3.

80. El Municipio también realizó una determinación de los daños a todo el tramo del camino público "Las Quintas" con la intención de preparar las reclamaciones a FEMA para el reembolso de las obras públicas necesarias para reestablecer el camino a su condición inicial antes del fenómeno.

81. Los daños observados por el Municipio fueron al asfalto, a [las cunetas], y a los "box curvets" que pasan por debajo de la carretera para las corrientillas de agua.

82. El Municipio ha reclamado a FEMA por concepto de daños al camino Las Quintas en el Huracán María por la cantidad total de $1,195,434.00[,] según el Cost Estimate Format proporcionado por FEMA.

83. También[,] se realizó un Site Inspection Report sometido a FEMA, así como [una] declaración jurada del inspector de proyectos Sr. Rafael Figueroa Ríos, con fecha del 27 de febrero de 2020, certificando el documento titulado "Debris Removal Total Cost Breakdown" y dando fe de los trabajos allí descritos en la [carretera] del Sector Las Quintas.

84. El 9 de julio de 2020, bajo el contrato 2021-000023, el Municipio contrató con Harry Auto Cool, Inc., para la pavimentación de 1,616.32 toneladas de asfalto, la limpieza de orillas del Sector Las Quintas, y [la] rotulación para un costo total de $192,982.00.

85. Esta obra se realizó en cumplimiento con el proyecto de repavimentación para ser financiado con fondos CDBG 2019.

86. El Municipio continuamente [le] ha representado a FEMA que el camino "Las Quintas" es un camino público.

87. Esta representación del Municipio al gobierno federal se puede trazar desde la administración de la exalcaldesa Hon. Irma Pedraza de Ortiz, ya que así fue identificado en el referido Contrato 95-43 del 14 de noviembre de 1994 para repavimentación, en su cláusula décima sexta, expresando que el contrato sería pagado con fondos federales.

88. En 1986[,] el Municipio no daba mantenimiento ni embreaba caminos privados, sino a caminos que dieran acceso a diferentes sectores para beneficiar a varios vecinos, y no a una persona en particular.

89. En la actualidad[,] el Municipio no da mantenimiento ni embrea caminos privados, sino a caminos que den acceso a diferentes sectores para beneficiar a varios vecinos, y no a una persona en particular.

90. El Municipio considera el camino como [uno] municipal y, por lo tanto, el Municipio se hace responsable siempre de ese camino, aunque no haya sido con el proceso que típicamente se conoce, donde el Municipio lo acepta por vía de una ordenanza municipal.

91. Después del mejoramiento del camino vecinal[,] se han desarrollado muchas viviendas.

92. Así también[,] se han desarrollado proyectos de vivienda como Mansiones de Vista Mar.

93. El camino municipal ha fortalecido y estimulado el desarrollo residencial del área.

94. El camino municipal siempre ha sido indispensable para el desplazamiento de muchos vecinos del área por su cercanía al pueblo y al expreso José Celso Barbosa.

95. El camino municipal también es una ruta utilizada por muchos por las vistas panorámicas que ofrece hacia el mar.

96. El camino es utilizado a diario por caminantes, ciclistas, jinetes y/o vehículos.

97. El Municipio ha sido el único encargado de asfaltar, mejorar y ensanchar el camino público.

98. El Municipio ha sido el único encargado de mantener las orillas del camino asfaltado [*sic*] y áreas verdes desyerbadas y limpias.

99. El camino asfaltado y su zona de seguridad han sido mantenido exclusivamente por el Municipio.

100. El demandante ha declarado reiteradamente que el camino y su orilla por el cual discurren los postes de PRTC ha [*sic*] sido asfaltado y mantenido por el Municipio.

101. El demandante nunca ha mantenido ni embreado el camino ni sus áreas verdes.

102. El camino y la zona de seguridad son mantenido[s] con fondos públicos y empleados municipales.

103. El camino es vecinal desde tiempo inmemorial.

104. El demandante sabía que el camino era vecinal [*sic*] antes de adquirir el terreno.

105. El demandante utilizaba el camino vecinal desde niño para recoger frutos menores.

106. El [d]emandante ha reiterado que voluntariamente consintió y autorizó hace alrededor de 44 años[,] en 1986[,] para que se usaran fondos públicos para embrear el camino de tierra que discurría por su finca bajo la administración del exalcalde Camacho Par[r]illa (q.e.p.d.).

107. El demandante ha reiterado que voluntariamente consintió y autorizó hace alrededor de 27 años[,] en 1994[,] al uso de fondos públicos para el ensanche y repavimentación del camino por la exalcaldesa Hon. Irma Pedraza (q.e.p.d.).

108. El demandante permitió el ensanche por parte de la Hon. Ped[r]aza (i.e. 1994) porque tenía planificado un desarrollo de solares en una parte de la finca.

109. En ningún momento[,] el demandante ha trancado o de alguna otra manera prohibido el paso vehicular por el camino en cuestión.

110. El demandante es abogado en Puerto Rico.

111. Los postes de PRTC están hincados en la zona mantenida exclusivamente por el Municipio.

112. La cablería de PRTC sobrevuela la zona mantenida exclusivamente por el Municipio.[19]

A juicio del foro primario, el señor Ávila y la señora Alicea no cumplieron con los requisitos estatuidos en la Regla 36 de las de Procedimiento Civil, *supra*. Específicamente, el foro apelado enfatizó

---

[19] *Íd.*, págs. 3-10.

que "la parte demandante no se opuso de forma **específica y completa** a *múltiples* hechos claves propuestos por el Municipio y PRTC".[20] Los hechos claves a los cuales alude el tribunal son los contenidos en los acápites 2, 35-39, 41-49, 51-72 de los hechos que no están en controversia, según discutido en la moción del Municipio. Asimismo, los hechos adicionales 1 y 6-8, según propuestos por la PRTC, tampoco fueron adecuadamente controvertidos. Por ello, el TPI expresó que "está obligado a considerar dichos hechos como incontrovertidos".[21]

Mediante el dictamen pronunciado, se declaró *ha lugar* a la *Moción de Sentencia Sumaria* incoada por el Municipio. A base de los hechos incontrovertidos y la prueba analizada, el TPI dictaminó que la parcela de terreno en disputa era un camino público que le pertenece al Municipio y que este lo adquirió por afectación. Asimismo, justipreció que los postes de la PRTC están ubicados en una zona de seguridad que también es de dominio público; por ello, no es procedente que la PRTC le indemnice al señor Ávila y a la señora Alicea por su uso. Además, como el acceso al camino vecinal estaba enclavado por la finca de los apelantes, estableció una servidumbre de paso para garantizar la entrada a la vía pública.

Inconformes con dicho dictamen, el señor Ávila y la señora Alicea presentaron un recurso de apelación ante esta Curia el 9 de julio de 2025 y señalaron que el TPI cometió los siguientes errores:[22]

> Erró el Honorable Tribunal De Primera Instancia al dictar sentencia sumaria y desestimar la demanda, a pesar de subsistir hechos materiales controvertidos, en manifiesta contravención de la Regla 36 de Procedimiento Civil. De igual modo, el remedio sumario es improcedente como cuestión de derecho.

> Erró el Honorable Tribunal De Primera Instancia al resolver que los postes de PRTC ubican en una zona de seguridad afecta a un bien de dominio público, en claro

---

[20] *Moción de Sentencia Sumaria Parcial*, SUMAC en el caso NSCI201200703, entrada 20, pág. 20. (Énfasis suplido).
[21] *Íd.*, pág. 21.
[22] *Apelación*, SUMAC-TA, entrada 1.

menoscabo del derecho constitucional a la propiedad y a el debido proceso de ley.

Erró el Honorable Tribunal De Primera Instancia al concluir que la finca donde se ubican las torres de telecomunicaciones constituye una finca enclavada, sin considerar que esa porción de terreno forma parte integral de la finca del demandante-apelante.

Erró el Honorable Tribunal De Primera Instancia al concluir que la demanda estaba prescrita, que procedía la aplicación de la doctrina de incuria, que el demandante-apelante había comparecido con las llamadas "manos sucias" y que actuaba en contra de sus propios actos, cuando del texto expreso del Código Civil, así como de la prueba presentada y estipulada en el expediente, surge de manera inequívoca todo lo contrario.

Erró el Honorable Tribunal De Primera Instancia al concluir que los servicios de telecomunicaciones constituyen un servicio esencial según la política pública establecida en la ley núm. 5-2018, en contravención directa de la doctrina de la irretroactividad de las leyes y del Artículo II, Sección 9 de nuestra Constitución.[23]

El 7 de agosto de 2025, la PRTC radicó su *Alegato de PRTC en Oposición a la Apelación*.[24] En síntesis, sostuvo que el foro primario no erró en su determinación, debido a que su exposición de hechos incontrovertidos se basó en la prueba que tuvo ante su consideración. También, arguyó que no existía controversia de hechos materiales, debido a que las determinaciones de hechos número 1-29 se basaron en estipulaciones y que las número 21 y 22 sobre la cantidad de postes y sus respectivos dueños fueron modificadas por una vista celebrada el 10 de noviembre de 2021; la información correcta y por la cual no hay controversia sobre la cantidad de postes de la PRTC, según se desprendió de la audiencia, se encuentran las determinaciones número 30-34. Asimismo, argumentó que los postes aludidos se encontraban hincados o sobre el vuelo de la zona de seguridad mantenida por el Municipio y que la cablería contenida en estos se dirigía únicamente hacia las torres

---

[23] *Íd.*, págs. 9-10.
[24] *Alegato de PRTC en Oposición a la Apelación, Íd.*, entrada 3.

de telecomunicaciones de AT&T y SBA, las cuales están sitas en terreno privativo de los apelantes y por las cuales estos devengan ingresos por concepto de cánones de arrendamiento. Por último, la PRTC destacó que el señor Ávila y la señora Alicea no se opusieron correctamente a la solicitud de sentencia sumaria incoada por el Municipio o a los hechos incontrovertidos adicionales sometidos por la compañía; esto debido a que, no cumplió cabalmente con los requisitos de la Regla 36 de las de Procedimiento Civil, *infra,* por no haber hecho referencia a la prueba sometida o que obraba en el expediente y por no ser lo suficientemente específicos en su refutación de la mayoría de los hechos propuestos como incontrovertidos en el petitorio.

El 15 de agosto de 2025, el Municipio presentó su *Alegato del Municipio de Ceiba.*[25] En suma, esbozó argumentos similares a los de la PRTC en cuanto a la zona de seguridad y la cablería telefónica. Asimismo, sostuvo que el camino y la zona de seguridad que se encuentran enclavados en la finca de los apelantes son de naturaleza pública, debido a que quien siempre les ha dado mantenimiento es el ente gubernamental. Destacó también que el camino está en uso constante por vecinos y por el paso de automóviles por el área, lo cual lo convirtió en un bien de dominio público por afectación. Así, razonó que el TPI resolvió correctamente al declarar que el camino era uno público y que procedía establecer una servidumbre de paso por finca enclavada porque el camino y la zona de seguridad quedaban rodeadas por la propiedad de los apelantes; por ello, para tener acceso a la vía pública, era correcto el imponer este gravamen.

---

[25] *Alegato del Municipio de Ceiba, Íd.,* entrada 6.

**II.**

**A.**

Es harto conocido que el mecanismo procesal de la sentencia sumaria se rige por la Regla 36.1 de las de Procedimiento Civil.[26] El propósito de esta regla es facilitar la solución justa, rápida y económica de litigios civiles en los cuales no existe controversia real y sustancial de hechos materiales que no requieren ventilarse en un juicio plenario.[27] De esta forma, se promueve la descongestión de calendarios.[28]

Por medio de este mecanismo, una parte puede solicitar que el tribunal dicte sentencia sumaria de la totalidad de la reclamación o de parte de esta.[29] Sin embargo, la sentencia sumaria solo está disponible para la disposición de aquellos casos que sean claros: cuando el tribunal tenga ante sí la verdad de todos los hechos esenciales alegados en la demanda y que solo reste por disponer las controversias de derecho existentes.[30]

El promovente de una sentencia sumaria deberá establecer, mediante declaraciones juradas o con prueba admisible en evidencia, que no existe controversia real respecto a hechos materiales de la polémica.[31] Por hechos materiales se entienden aquellos que pueden afectar el resultado de una reclamación de acuerdo con el derecho sustantivo.[32] De igual modo, la parte promovente puede presentar una sentencia sumaria por insuficiencia de prueba si demuestra que: (1) no es necesario celebrar una vista; (2) el demandante no cuenta con evidencia para

---

[26] Regla 36.1 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 36.1.
[27] *Rodríguez García v. UCA*, 200 DPR 929, 940 (2018); *Bobé et al. v. UBS Financial Services*, 198 DPR 6, 19-20 (2017); *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013).
[28] *Vera v. Dr. Bravo*, 161 DPR 308, 331-332 (2004).
[29] *Íd.*, pág. 332.
[30] *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, 136 DPR 881, 911-912 (1994).
[31] Regla 36.1 de las de Procedimiento Civil, *supra; Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 110 (2015).
[32] *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010).

probar algún hecho sustancial, y (3) procede como cuestión de derecho.[33]

En contraste, el oponente a la moción de sentencia sumaria está obligado a establecer que existe una controversia que sea real por lo cual cualquier duda es insuficiente para derrotar una solicitud de sentencia sumaria.[34] En efecto, la duda debe ser tal que permita concluir que existe una controversia real y sustancial sobre los hechos materiales.[35] De esta manera, la parte promovida debe puntualizar los hechos propuestos que pretende controvertir, haciendo referencia a la prueba específica que sostiene su posición.[36] Es decir, **"la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa"**.[37] **No puede descansar en meras aseveraciones o negaciones de sus alegaciones, sino que debe proveer contradeclaraciones juradas y documentos que sustenten los hechos materiales en disputa**.[38] En síntesis, ha quedado establecido que los tribunales no pueden dictar sentencia sumaria en cuatro (4) situaciones: (1) cuando existan hechos materiales y esenciales controvertidos; (2) cuando existen alegaciones afirmativas en la demanda sin refutar; (3) cuando surge de los propios documentos que acompañan la moción en solicitud de sentencia sumaria que existe una controversia sobre algún hecho material o esencial, o (4) cuando no procede como cuestión de derecho.[39]

Entretanto, la Regla 36.3 de las de Procedimiento Civil, *supra,* establece el procedimiento para la consideración de la moción de

---

[33] *Pérez v. El Vocero de PR*, 149 DPR 427, 446-447 (1999).
[34] *Meléndez González et al. v. M. Cuebas*, supra, pág. 110.
[35] *Íd.* (*citando a Ramos Pérez v. Univisión,* supra, pág. 214).
[36] *León Torres v. Rivera Lebrón,* 204 DPR 20, 44 (2020).
[37] *Íd.* (Énfasis suplido).
[38] Regla 36.3 (c) de las de Procedimiento Civil, *supra*, R. 36.3 (c); véase *SLG Zapata-Rivera v. JF Montalvo*, supra, pág. 452-453; *Ramos Pérez v. Univisión*, supra, págs. 215-216.
[39] *Oriental Bank v. Perapi*, 192 DPR 7, 26-27 (2014).

sentencia sumaria, así como el contenido de la moción y de la contestación de la parte promovida.[40] Respecto a la moción solicitando que se dicte una sentencia sumaria, la Regla 36.3 (a) de las de Procedimiento Civil dispone que la misma tiene que desglosar lo siguiente:

> (1) una exposición breve de las alegaciones de las partes;
> (2) los asuntos litigiosos o en controversia;
> (3) la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria;
> (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;
> (5) las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y
> (6) el remedio que debe ser concedido.[41]

Mientras tanto, la Regla 36.3 (b) de las de Procedimiento Civil prescribe que la contestación a la moción de sentencia sumaria debe contener, además de los sub incisos (1), (2) y (3) del inciso (a): una relación de los hechos esenciales y pertinentes que están en controversia, con referencia a los párrafos enumerados por la parte promovente y con indicación de la prueba en la que se establecen esos hechos; una enumeración de los hechos que no están en controversia; y las razones por las cuales no se debe dictar la sentencia, argumentando el derecho aplicable.[42] Asimismo, cuando se presente una solicitud de sentencia sumaria conforme a la Regla 36 de las de Procedimiento Civil "la parte contraria no podrá descansar solamente en las aseveraciones o negaciones contenidas en sus alegaciones, sino que estará obligada a contestar en forma tan detallada y específica como lo haya hecho la parte promovente.

---

[40] Regla 36.3 de Procedimiento Civil, *supra*, R. 36.3.
[41] *Íd.*, R. 36.3 (a).
[42] *Íd.*, R. 36.3 (b).

De no hacerlo así, se dictará la sentencia sumaria en su contra si procede".[43]

En esa misma línea, la juzgadora o el juzgador de los hechos debe evaluar la prueba presentada para determinar cuáles hechos han quedado demostrado sujeto a que "[e]l peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por alguna de las partes";[44] "[l]a obligación de presentar evidencia primariamente recae sobre la parte que sostiene la afirmativa en el asunto en controversia";[45] y, en casos civiles, la decisión de la juzgadora y el juzgador se realizará mediante la preponderancia de la prueba conforme a criterios de probabilidad.[46] La preponderancia de la prueba ha sido definida como cuando se establece "como hechos probados que con mayores probabilidades ocurrieron".[47]

De otra parte, nuestro Tribunal Supremo delineó el estándar que el Tribunal de Apelaciones debe utilizar para revisar una denegatoria o una concesión de una moción de sentencia sumaria.[48]

En primer lugar, reafirmó que el Tribunal de Apelaciones se encuentra en la misma posición que el TPI al momento de revisar solicitudes de sentencia sumaria, siendo su revisión una *de novo* y teniendo la obligación de regirse por la Regla 36 de las de Procedimiento Civil,[49] al igual que los criterios que la jurisprudencia le exige al foro primario. Asimismo, debe examinar el expediente de la manera más favorable hacia la parte promovida, llevando a cabo todas las inferencias permisibles a su favor. Ahora bien, nuestro máximo foro reconoció que el foro apelativo está limitado, toda vez que no puede tomar en consideración evidencia que las partes ni

---

[43] *Íd.*, R. 36.3 (c).
[44] Regla 110 (A) de Evidencia, 32 LPRA Ap. VI, R. 110 (A).
[45] *Íd.*, R. 110 (B).
[46] *Íd.*, R. 110 (F).
[47] *Berríos v. U.P.R.*, 116 DPR 88, 101 (1985) (citando a *Zambrana v. Hospital Santo Asilo de Damas*, 109 DPR 517, 521 (1980)).
[48] *Meléndez González et al. v. M. Cuebas*, supra.
[49] Regla 36 de las de Procedimiento Civil, *supra*.

presentaron ante el foro primario ni adjudicar los hechos materiales en controversia.[50]

En segundo lugar, señaló que el Tribunal de Apelaciones debe revisar que tanto la moción en solicitud de sentencia sumaria como la oposición cumplan con los requisitos de forma codificados en la Regla 36 de las de Procedimiento Civil.[51]

En tercer lugar, ordenó que, ante la revisión de una sentencia dictada sumariamente, el Tribunal de Apelaciones debe revisar si en realidad existen hechos materiales en controversia y, de haberlos, estará obligado a exponer específicamente cuáles hechos materiales están en controversia y cuáles no, en cumplimiento con la Regla 36.4 de las de Procedimiento Civil.[52]

En cuarto lugar, dispuso que, si encuentra que los hechos materiales realmente no están en controversia, entonces el Tribunal de Apelaciones deberá revisar *de novo* si el foro primario aplicó correctamente el derecho a la controversia.[53]

**B.**

Nuestro ordenamiento jurídico divide los bienes de acuerdo con las personas a quienes pertenecen. En ese sentido, adoptó una norma tripartita, según la cual los bienes pueden ser comunes, de dominio público o de dominio privado.[54]

El Artículo 254 del Código Civil de 1930[55] describe los bienes comunes como aquellos "cuya propiedad no pertenece a nadie en particular y en las cuales todos los hombres tienen libre uso, en

---

[50] *Meléndez González et al. v. M. Cuebas*, supra, pág. 118.

[51] *Íd.*; Regla 36 de las de Procedimiento Civil, *supra.*

[52] *Meléndez González et al. v. M. Cuebas*, supra, pág. 118; Regla 36.4 de las de Procedimiento Civil, *supra.*

[53] *Meléndez González et al. v. M. Cuebas*, supra, pág. 119.

[54] *Watchtower Bible et al. v. Mun. Dorado I,* 192 DPR 73, 84 (2014); *San Gerónimo Caribe Project v. ELA I*, 174 DPR 518, 557 (2008).

[55] Aludimos a las disposiciones del derogado Código Civil de 1930 por estar vigente al momento de los hechos que generaron esta controversia. El código Civil de 1930 fue revocado y sustituido por la Ley Núm. 55-2020, conocida como el *Código Civil de Puerto Rico.*

conformidad con su propia naturaleza: tales son el aire, las aguas pluviales, el mar y sus riberas".[56]

Por su parte, el Artículo 255 dispone que "[s]on bienes de dominio público, los destinados al uso público, como los caminos, ríos, torrentes, y otros análogos".[57] A su vez, el Artículo 256 establece que son bienes de uso público "los caminos estaduales y los vecinales, las plazas, calles, fuentes y aguas públicas, los paseos y las obras públicas de servicio general, costeadas por los mismos pueblos o con fondos del tesoro de Puerto Rico".[58]

Los bienes enumerados en los Artículos 255 y 256 del Código Civil de 1930, *supra,* se complementan con las disposiciones del Artículo 274 del mismo cuerpo legal, que puntualiza otros bienes a los cuales se les puede considerar como de dominio público, aunque no estén específicamente enumerados. Así, el Artículo 274 establece que:

> Entre las cosas que no son susceptibles de apropiación están comprendidas aquellas que no pueden ser propiedad particular por razón de su objeto, tales como las cosas en común o sean aquéllas cuyo uso y disfrute pertenece a todos los hombres.
>
> Hay otras cosas, por el contrario, que aunque por su naturaleza son susceptibles de propiedad particular, pierden esta cualidad como consecuencia de la aplicación que de ellas se hace para fines públicos incompatibles con la propiedad privada, si bien pueden adquirir su primitiva condición tan pronto cese el fin público que se l[e]s hubiera dado; tales son los terrenos de las carreteras, calles y plazas públicas.[59]

Debemos añadir que, contrario a lo que sucede con los bienes privados —que las personas pueden disponer de ellos libremente sin más limitaciones que las impuestas por la ley— los bienes de dominio público gozan de una tutela diferente al ser inembargables, imprescriptibles e inalienables.[60] Estos bienes están fuera del

---

[56] 31 LPRA ant. sec. 1023.
[57] *Íd.*, ant. sec. 1024.
[58] *Íd.*, ant. sec. 1025.
[59] *Íd.*, ant. sec. 1082.
[60] *Íd.*, ant. sec. 1084.

comercio porque ni se pueden enajenar ni poseer privadamente por disposición de ley.[61]

Al respecto, el Artículo 256 del Código Civil de 1930, *supra*, indica en su segundo párrafo que "[t]odos los demás bienes que el Estado Libre Asociado de Puerto Rico o los municipios posean, son patrimoniales y se regirán por las disposiciones de este título".[62]

A su vez, el Artículo 257 expresa que "[s]on bienes de propiedad privada, además de los patrimoniales del pueblo de los Estados Unidos, del Pueblo de Puerto Rico y de los municipios, los pertenecientes a particulares individual o colectivamente".[63]

El profesor Vélez Torres reseña la diferencia entre los bienes de dominio público y dominio privado del Estado de la siguiente manera:

> Los bienes de propiedad privada son aquellos que, aun perteneciendo al Estado, son susceptibles de tráfico jurídico y están sujetos, en cuanto a su adquisición, disfrute, administración y enajenación a las reglas que, sobre el particular, dicta el Derecho privado vigente.
>
> (…)
>
> Los bienes patrimoniales del Estado son poseídos por éste, o por sus subdivisiones políticas, para cumplir con un fin público, pero, a diferencia de lo que ocurre con los bienes de dominio público, el público no tiene constante y general acceso a ellos…. Colín y Capitant, distinguiendo entre los bienes de dominio público y los de dominio privado del Estado, se expresan:
>
> "El *dominio privado* comprende los bienes que el Estado posee y administra como un particular, que le producen ingresos, que puede enajenar, por lo menos, en general, y que en nada se diferencian, por lo tanto, exteriormente de las cosas susceptibles de propiedad privada. Una granja modelo, una yeguada, un bosque, una fábrica de tabacos o de cerillas esto es lo que forma parte del dominio privado. El Derecho [C]ivil aparece como el normalmente aplicable a los actos de que estos bienes pueden ser objeto.
>
> "El dominio público, por el contrario… lo forman bienes que sirven para el uso de todos, como los ríos, los puertos, los caminos, las calles, las plazas públicas.

---

[61] *Watchtower Bible et al. v. Mun. Dorado I,* supra, pág. 85; *San Gerónimo Caribe Project v. ELA I*, supra, págs. 558 y 561.
[62] 31 LPRA ant. sec. 1025.
[63] *Íd.*, ant. sec. 1026.

Estos bienes, evidentemente, no están sometidos a las reglas de Derecho [C]ivil concernientes a la propiedad."

Siguen dichos autores, estableciendo diferencias entre el dominio público y el dominio privado del Estado:

1) el dominio público es inalienable; no así el dominio privado del Estado, que puede enajenarse con arreglo a la ley;

2) el dominio público es imprescriptible; el dominio privado, en cambio, puede prescribirse;[64]

3) el dominio público no puede ser gravado con servidumbre o carga alguna; los bienes patrimoniales, en cambio, pueden gravarse;

4) también se ha dicho que el dominio público es inembargable. Pero esta característica no puede distinguirle de los bienes patrimoniales del Estado, que también son inembargables, a base del principio al defecto de que al Estado siempre se presume solvente.[65]

Ahora bien, un bien privado puede transformarse en uno de dominio público, y viceversa, mediante actos de afectación y desafectación.[66] La afectación necesariamente implica que determinado bien ha sido destinado a un fin de interés público particular y puede deducirse de una declaración legislativa o mediante actos administrativos del Estado al amparo de una ley.[67] "Así, podríamos decir que luego de que el legislador advierte una necesidad social, fija los objetivos que constituyen la razón para someter al [dominio público] cierta categoría de bienes".[68]

Por otra parte, un bien cuyo uso es común, por su naturaleza, puede adquirir la clasificación de dominio público, sin que se requiera un acto formal de afectación.[69] Asimismo, la doctrina

---

[64] *ELA v. Tribunal Superior,* 97 DPR [644] (1969); *Rubert Armstrong v. ELA,* 97 DPR 588 (1969). En estos casos, se resuelve que, con excepción de terrenos baldíos insulares y terrenos de carreteras y caminos públicos, los bienes patrimoniales del Estado son susceptibles de adquisición por los particulares mediante la usucapión. Las dos excepciones notables están señaladas en el Código Político en sus artículos 9 (terrenos baldíos) y 405 (terrenos de carreteras y caminos públicos).

[65] J. R. Vélez Torres, *Curso de Derecho Civil,* 4.ª ed., Madrid, Offirgraf, S.A, 2002*,* T. II*,* pág. 42.

[66] *Watchtower Bible et al. v. Mun. Dorado I,* supra, pág. 88*; San Gerónimo Caribe Project v. ELA I,* supra, pág. 558.

[67] *Watchtower et al. v. Mun. Dorado I,* supra, pág. 89*.*

[68] *Íd.,* pág. 90.

[69] *San Gerónimo Caribe Project v. ELA I,* supra, pág. 523; 31 LPRA ant. sec. 1024.

también reconoce la posibilidad de que tenga lugar la afectación de un bien mediante un acto singular del soberano para construir o establecer un inmueble para fines públicos.[70] Por tanto, de lo anterior se puede colegir que:

> [el] carácter de dominio público de un bien, no depende de su naturaleza física o geológica. Lo determinante es su finalidad: el uso público del mismo. *De ahí que un bien, originalmente de dominio público, pueda transformarse en bien patrimonial, susceptible de enajenación, si su uso cesa de ser público.*[71]

Como corolario de lo anterior, un bien afecto a un fin de interés público, puede advenir a ser de carácter privado y, por consiguiente, susceptible de apropiación individual, mediante un acto de desafectación.[72] Esta figura se perfila como la antítesis de la afectación, toda vez que produce el efecto de la pérdida de la clasificación de dominio público del bien objeto de tal acto. Así, para que éste adquiera condición de propiedad particular, se exige que haya cesado el fin que se le hubiere dado.[73] Ahora bien, "la desafectación procede del mismo modo en que tuvo lugar la afectación".[74] De esta manera, el hecho de que haya cesado el uso público, por sí solo, no resulta suficiente a tal fin.

La mutación dominical correspondiente en virtud de la desafectación exige que medie: (1) un acto soberano, ya sea mediante la aprobación de una ley a tales efectos o mediante un acto administrativo al amparo de los poderes delegados para ello; o, (2) por cambios en la condición natural de los bienes que los excluyan de la clasificación contemplada por la propia ley.[75] "De hecho, nuestro ordenamiento puede requerir una combinación de las

---

[70] *Watchtower Bible et al. v. Mun. Dorado I,* supra, pág. 90*; San Gerónimo Caribe Project v. ELA I*, supra, pág. 523.

[71] *Íd.,* pág. 565 (citando a M. Godreau y J.A. Giusti, *Las concesiones de la Corona y propiedad de la tierra en Puerto Rico, siglos XVI-XX: Un estudio jurídico*, 62 Rev. Jur. UPR 351, 563 (1993)).

[72] *San Gerónimo Caribe Project v. ELA I,* supra, págs. 556-557.

[73] *Íd.,* págs. 565-566.

[74] *Íd.,* pág. 566.

[75] *Íd.,* pág. 567.

modalidades de desafectación para que esta proceda conforme a derecho".[76]

## C.

La servidumbre se define como un gravamen impuesto sobre un inmueble (predio sirviente) en beneficio de otro perteneciente a un dueño distinto (predio dominante).[77] Al amparo del Artículo 500 del Código Civil de 1930, "[e]l propietario de una finca o heredad enclavada entre otras ajenas y sin salida a camino público, tiene derecho a exigir paso por las heredades vecinas, previa la correspondiente indemnización".[78] El Artículo 501 dispone que la servidumbre de paso "debe darse por el punto menos perjudicial al predio sirviente, y en cuanto fuere conciliable con esta regla por donde sea menor la distancia del predio dominante al camino público".[79] Además, y, en lo aquí pertinente, el Artículo 502 establece que el ancho de la servidumbre de paso "será la que baste a las necesidades del predio dominante".[80]

La doctrina define el derecho de servidumbre como uno subjetivo, de carácter real y perpetuo, capaz de conceder la facultad de obtener determinado goce o utilidad proveniente de un fundo, a favor de otro ajeno.[81] El mismo constituye una limitación al derecho de propiedad, toda vez que su ejercicio restringe las libertades del titular de la finca gravada en cuanto al disfrute que, de otro modo, ostentaría sobre su inmueble.[82] Estas servidumbres pueden ser continuas o discontinuas, así como aparentes o no aparentes.[83] De

---

[76] *Íd.,* págs. 567-568.
[77] 31 LPRA ante sec. 1631; *Ciudad Real v. Municipio de Vega Baja*, 161 DPR 160 (2004); *Soc. de Gananciales v. Mun. de Aguada*, 144 DPR 114 (1997).
[78] 31 LPRA ant. sec. 1731.
[79] *Íd.*, ant. sec. 1732.
[80] *Íd.*, ant. sec. 1733.
[81] J. R. Vélez Torres, *Curso de Derecho Civil; Los bienes; Los derechos reales*, San Juan, Universidad Interamericana de Puerto Rico, Facultad de Derecho, 2005, T. II, Cap. XIV, pág. 355.
[82] *Íd.*, pág. 359.
[83] 31 LPRA ant. sec. 1634.

otra parte, en cuanto su naturaleza, las servidumbres pueden ser legales o voluntarias.[84]

Asimismo, el Código Civil de 1930 impone ciertas restricciones a los dueños de los predios dominantes y sirvientes, en cuanto al uso de las servidumbres en general y en lo que respecta a este caso, a las servidumbres de paso. Al detallar las obligaciones del dueño del predio dominante, el Artículo 479 del Código Civil de 1930 expresa que:

> El dueño del predio dominante podrá hacer a su costo en el predio sirviente las obras necesarias para el uso y conservación de la servidumbre, **pero sin alterarla ni hacerla más gravosa**. Deberá elegir para ello el tiempo y la forma convenientes, **a fin de ocasionar la menor incomodidad posible al dueño del predio sirviente**.[85]

El Profesor Vélez Torres añade que, dentro de las obligaciones reputadas al dueño del predio dominante, este deberá:

> (1) abstenerse de usar la servidumbre para beneficio de predios ajenos; (2) abstenerse de practicar variación alguna que pueda constituir un exceso en el uso de la servidumbre; (3) utilizar la servidumbre sólo en lo necesario para el destino y uso conveniente del predio dominante, con el menor daño del predio sirviente; (4) ejecutar y costear, en su caso, las obras necesarias para el uso y conservación de la servidumbre, sin hacerla más gravosa.[86]

El Tribunal Supremo ha destacado que, por medio de una servidumbre de paso, la titularidad sobre el derecho adquirido por el dueño del predio dominante se estima sobre la servidumbre, no así sobre el derecho al paso a través de ella. Así lo expreso el alto foro al citar a Casals Colldecarrera:

> Criterio similar al nuestro expresa Casals Colldecarrera en el Derecho Real de Servidumbre, ed. 1941, donde a la pág. 109, expresa:
>
> > "**El propietario del predio dominante no adquiere por la indemnización la propiedad del paso, sino solamente el derecho de servidumbre, que no implica expropiación, sino limitación de la propiedad**. En virtud de esto, el dueño del predio sirviente puede seguir utilizando éste como mejor le

---

[84] *Íd.*, ant. sec. 1638.
[85] *Íd.*, ant. sec. 1671. (Énfasis suplido).
[86] Vélez Torres, *Op. cit.*, pág. 372.

**convenga, a condición siempre de no obstaculizar el paso,** y en caso de que impidiera el ejercicio de la servidumbre, tiene el [predio] dominante acción para pedir la libertad de su vía. ¿Quiere decir esto, sigue Manresa, que la existencia de servidumbre de paso a través de una finca es obstáculo para que el dueño de ésta pueda cercar o [cerrar] convenientemente su fundo? Evidentemente que no, puesto que cerrar un fundo es un acto de libre dominio, y el dueño del predio sirviente puede hacerlo libremente, dejando a salvo la servidumbre mediante puertas o cierres que no impidan el ejercicio de la misma."[87]

Al citar a Federico Puig Peña, el Tribunal Supremo puntualiza lo siguiente:

"Abstenerse de menoscabar en modo alguno el uso de la servidumbre constituida. La principal obligación que tiene el dueño del predio sirviente es abstenerse de menoscabar en modo alguno el uso de la servidumbre constituida (art. 545). Esta obligación es puramente pasiva, y, por consiguiente, consiste en mantener una conducta de omisión, no haciendo lo que la servidumbre tiene por fin impedir (como en la *non edificandi, non altius tollendi,* etc.) o permitiendo, sin poner ninguna traba, al propietario del predio dominante realizar actos constitutivos de la servidumbre, como sucede, por ejemplo, en materia de servidumbre de pasto, de saca de aguas, etc. La expresión menoscabo que emplea el Código significa, no sólo realizar la acción decididamente contraria —como, por ejemplo, oponerse resueltamente al uso de una servidumbre positiva— sino también dificultar el ejercicio, como sería, por ejemplo, si se cultivara la faja de terreno de una servidumbre de paso o si se plantaran árboles que dificultaran la circulación del ganado, en una servidumbre de paso."[88]

No obstante, el dueño del predio sirviente puede preterir la norma antes indicada en algunas circunstancias delimitadas por el propio Artículo 481. En ese sentido:

[S]i por razón del lugar asignado primitivamente, o de la forma establecida para el uso de la servidumbre, llegare ésta a ser muy incómoda al dueño del predio sirviente o le privase de hacer en él obras, reparos o mejoras importantes, podrá variarse a su costa, siempre que ofrezca otro lugar o forma igualmente cómodos, y de suerte que no resulte perjuicio alguno al dueño del predio dominante o a los que tengan derecho al uso de la servidumbre.[89]

---

[87] *López Amaral v. Márquez*, 102 DPR 239, 244-245 (1974). (Énfasis suplido).
[88] *Íd.*, págs. 243-244 (citando a F. Puig Peña, *II Compendio de Derecho Civil Español*, 3.ª ed., Madrid, 1976 T. II, pág. 540).
[89] 31 LPRA ant. sec. 1673.

Por tratarse de una servidumbre discontinua, la servidumbre de paso no es susceptible de adquirirse mediante prescripción, solo en virtud de título, siendo la única excepción la servidumbre de signo aparente.[90] Se trata de una servidumbre discontinua porque su uso se revela en intervalos de longevidad esporádica y su aprovechamiento necesariamente requiere de actos de las personas.[91] A ello se suma que, al amparo del Artículo 481 del Código Civil de 1930:

> [e]l dueño del predio sirviente no podrá menoscabar de modo alguno el uso de la servidumbre constituida. Sin embargo, si por razón del lugar asignado primitivamente, o de la forma establecida para el uso de la servidumbre, llegare ésta a ser muy incómoda al dueño del predio sirviente o le privase de hacer en él obras, reparos o mejoras importantes, podrá variarse a su costa, siempre que ofrezca otro lugar o forma igualmente cómodos, y de suerte que no resulte perjuicio alguno al dueño del predio dominante o a los que tengan derecho al uso de la servidumbre.[92]

Nótese, además, que el propietario del predio dominante solo tiene un derecho de paso, no de propiedad sobre la servidumbre, lo que solamente representa una limitación al derecho de propiedad del dueño del predio sirviente. Por ello, el dueño del predio sirviente puede seguir utilizándolo como mejor le convenga, con la condición de no obstaculizar el paso.[93]

### III.

En el caso de marras, debemos resolver si procedía desestimar la acción reivindicatoria incoada por el señor Ávila y la señora Alicea. Además, nos corresponde determinar si el foro primario erró al declarar *ha lugar* a la *Moción de Sentencia Sumaria* presentada por el Municipio junto con el escrito complementario de la PRTC.

El señor Ávila y la señora Alicea plantearon que el foro primario estaba impedido de dictar sentencia sumaria a favor del

---

[90] *Soc. de Gananciales v. Srio. de Justicia,* 137 DPR 70, 78 (1994).
[91] *Íd.*
[92] 31 LPRA ant. sec. 1673.
[93] *López Amaral v. Márquez,* supra.

Municipio y la PRTC porque habían hechos en controversia que se debían dirimir en un juicio. Además, adujeron que pueden existir calles privadas en nuestra jurisdicción y que, como el camino era de su propiedad, el resto de las causas de acción se frustraban y correspondía entonces que la PRTC le indemnizara por el uso ilegal y no consentido de su terreno desde el 1998.

Por estar íntimamente relacionados, discutiremos los primeros dos errores apuntalados en conjunto.

Como hemos expuesto anteriormente, el primer y segundo paso del estándar que este Tribunal debe utilizar para revisar la concesión o denegatoria de una solicitud de sentencia sumaria es una revisión *de novo* del expediente del caso de epígrafe y corroborar que tanto la solicitud como la oposición a sentencia sumaria cumplan con los requisitos de la Regla 36 de las de Procedimiento Civil.[94] De una lectura cuidadosa de la solicitud de sentencia sumaria y el escrito complementario presentado por el Municipio y la PRTC, respectivamente, **colegimos que estos *cumplen* con los requisitos dispuestos por la Regla 36.3 (a) de las de Procedimiento Civil, *supra*.**[95] Específicamente, las peticiones contienen una exposición breve de las alegaciones de las partes; los asuntos litigiosos o en controversia; la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria; una relación concisa, organizada y en párrafos enumerando todos los hechos pertinentes y esenciales sobre los cuales no existe controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible, así como cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal, las razones por la cuales debe ser

---

[94] Regla 36 de las de Procedimiento Civil, *supra.*
[95] *Íd.*

dictada la sentencia sumaria con derecho aplicable y el remedio que debe ser concedido.

Por otra parte, la oposición a la sentencia sumaria del señor Ávila y la señora Alicea **incumplió con el requisito de aludir a los párrafos o las páginas de declaraciones juradas u otra prueba admisible**, así como cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal. La mayoría de sus refutaciones, incluyendo unas neurálgicas para sostener su postura, según señaladas por el foro primario, adolecen de este incumplimiento craso con nuestras reglas procesales.

El señor Ávila y la señora Alicea expresaron lo siguiente sobre los hechos incontrovertidos, según propuestos por el Municipio: "[e]ntendemos muy respetuosamente que los hechos a los que se refiere el Municipio no pueden utilizarse para resolver los hechos materiales en controversia. Son hechos colaterales a los hechos materiales pertinentes y esenciales en controversia".[96] Luego, comenzaron su exposición de refutación enumerada. Empero y como esbozamos anteriormente, la mayoría de estos incumplen con los sub-incisos (2) y (3) del inciso (b) de la Regla 36 de las de Procedimiento Civil, *supra*. Específicamente, estos no se apoyan sobre las piezas de evidencia y sus respectivas páginas, según surgen de la solicitud de sentencia sumaria y del expediente del caso; es decir, no aluden a las declaraciones juradas u otra prueba admisible para sustentar porqué tal hecho está en controversia. De los noventa y nueve (99) incisos aludiendo al petitorio del Municipio, setenta y cuatro (74) no fueron sustentados con prueba documental alguna. Similarmente, de los ocho (8) incisos refutando a la PRTC,

---

[96] *Oposición a Sentencia Sumaria del Municipio de Ceiba y Moción en Apoyo de Sentencia Sumaria de PRTC*, SUMAC en el caso NSCI201200703, entrada 23, pág. 11.

cuatro (4) de ellos no fueron sustentados con prueba documental alguna.

Consecuentemente, el foro primario no estaba obligado a "considerar aquellos hechos que no ha[bían] sido específicamente enumerados y que no t[enían] una referencia a los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen".[97]

Por guardar relación, discutiremos conjuntamente el tercer y cuarto paso de nuestro análisis. Es decir, debemos evaluar si existen hechos materiales en controversia y, de existir, delimitarlos. De no haber hechos en controversia, procede que revisemos *de novo* si el foro primario aplicó correctamente el derecho.

En el presente caso, después de un examen cuidadoso de la solicitud de sentencia sumaria, su escrito complementario y su oposición, concluimos que no existen hechos materiales en controversia o que pudiesen afectar el resultado de las reclamaciones de acuerdo con el derecho sustantivo aplicable.

**Según mencionamos en la sección anterior, el oponente a la moción de sentencia sumaria está obligado a establecer que existe una controversia que sea real, por lo cual cualquier duda es insuficiente para derrotar el petitorio sumario.** Al momento de controvertir los hechos propuestos por la otra parte, el oponente posee el peso para presentar evidencia sustancial que apoye los hechos materiales que arguye están en controversia. **En otras palabras, *no* puede descansar en meras aseveraciones o negaciones de sus alegaciones, sino que debe proveer contradeclaraciones juradas y documentos que sustenten los hechos materiales en disputa.**

---

[97] *Íd.*; véase *Meléndez González v. M. Cuebas,* supra.

En el caso de los apelantes, no surge de la demanda enmendada o de la oposición a la sentencia sumaria ni un solo hecho específico o documento sobre acto alguno que señale que el terreno embreado no ha sido afectado y que no se ha convertido en un bien de dominio público. Esto se debe a que, según los propios dichos del señor Ávila, los apelantes ni mantienen ni han mantenido el terreno embreado o sus áreas verdes aledañas desde que son los titulares de la finca; este mantenimiento lo proporciona ocasionalmente el Municipio. Además, no surge de los hechos o del expediente que el terreno esté destinado a un fin privado; incluso, el camino es utilizado por personas para trasladarse, sea a pie, en automóviles o en caballos, para así llegar a distintas partes del área, lo cual es un fin público en sí. Asimismo, no se desprende de los anejos considerados que los apelantes se hayan opuesto a la utilización de su terreno para tales fines. Tampoco los apelantes pusieron a los foros judiciales en posición para determinar la inexistencia de una zona de seguridad, la cual les facilita el paso a peatones, especialmente durante las noches, y sobre la cual se encuentran enterrados los postes de la PRTC. Entonces, como su naturaleza vecinal no pudo ser refutada, el tribunal no podría decir que la zona de seguridad no está enclavada, ya que esta tiene un fin público y es perteneciente al Municipio, aunque se encuentre rodeada por los terrenos privativos de los apelantes; adicionalmente, no se evidenció cómo esta franja de terreno es una "parte íntegra" de su propiedad.

En sentido contrario, el Municipio logró establecer mediante senda prueba documental y declaraciones juradas el hecho de que el terreno es utilizado para fines públicos. El camino funge como medio de tránsito para caminantes, jinetes y conductores. Además, facilita el acceso a diferentes partes del sector Las Quintas. Este

terreno, compuesto por la carretera asfaltada y la zona de seguridad, es conservado por el Municipio.

Como se ha explicado, para que el gobierno adquiera un bien o terreno por afectación, este debe utilizarse para un fin público. Las calles son un ejemplo representativo de un bien de dominio público, debido a que le permiten a los ciudadanos que se transporten seguramente de un lugar a otro. Aunque nuestro ordenamiento reconoce la existencia de las calles privadas, estas deben estar estrictamente destinadas a fines privativos para que conserven esa naturaleza. Hemos discutido que una calle o terreno privado puede adquirir un carácter demanial si es *mantenida* con fondos públicos.

En este caso, el señor Ávila comentó que nunca le ha dado mantenimiento al área polemizada. Además, el Municipio evidenció ampliamente los esfuerzos realizados para embrear, asfaltar y mantener el camino vecinal a través de los años con fondos públicos y hasta federales. El mero hecho de que quien costea y conserva el camino y la zona de seguridad es el Municipio es suficiente para afectar el terreno para que este se conciba como uno de dominio público. Colegimos, pues, que el foro primario no erró al declarar ha lugar a la solicitud de sentencia sumaria del Municipio y desestimar la demanda a su favor. Asimismo, y por los fundamentos previamente esbozados, el foro apelado tampoco incidió al resolver que los postes de la PRTC están ubicados en una zona de seguridad, la cual es también de naturaleza pública.

Por último, consideramos que el TPI no incidió al establecer una servidumbre de paso de finca enclavada para tener acceso a las torres de la PRTC.

Como hemos pormenorizado, una finca enclavada es aquella que no tiene acceso a la vía pública. Esto hace que sea obligatorio el establecer una servidumbre de paso sobre el predio sirviente para lograr el acceso a la vía pública y a la finca. El dueño del predio

sirviente debe tolerar el paso y, en ocasiones, puede ser remunerado por esto. Empero, "[s]i adquirida una finca por venta, permuta o partición, **quedare enclavada entre otras del vendedor**, permutante o copartícipe, éstos están obligados a dar paso sin indemnización, salvo pacto en contrario".[98]

En este caso, es necesario que se establezca una servidumbre de paso para acceder a las torres de la PRTC. Como estas están ubicadas alrededor de una finca de un mismo dueño, los apelantes, estos últimos no tendrían derecho a ser indemnizados por su uso y deben tolerar el paso gratuitamente. Es decir, el señor Ávila y la señora Alicea no tienen derecho a recibir una indemnización debido a que la finca municipal está enclavada por su terreno y el camino y la zona de seguridad no tienen acceso a la vía pública.

Por ser innecesario, no discutiremos los últimos dos planteamientos de error apuntalados por el señor Ávila y la señora Alicea.

A la luz de lo anteriormente expuesto, concluimos que el foro primario no incidió en los errores señalados por el señor Ávila y la señora Alicea.

Consecuentemente, confirmamos la fundamentada *Sentencia Sumaria* apelada.

**IV.**

En virtud de lo anterior, se confirma la *Sentencia Sumaria* apelada.

**Notifíquese.**

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís<br>
Secretaria del Tribunal de Apelaciones

---

[98] 31 LPRA ant. sec. 1734. (Énfasis suplido).